[No. S029550. June 17, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
DUANE HOLLOWAY, Defendant and Appellant.

## COUNSEL

Mark D. Greenberg, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, J. Robert Jibson, Ward A. Campbell and Raymond L. Brosterhous, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—A jury convicted defendant Duane Holloway of first degree murder (Pen. Code, § 187, subd. (a))[1] in the deaths of Debra Ann Cimmino and Diane Renee Pencin, attempted rape (§§ 261, 664) of Cimmino, and burglary (§ 459) of the victims' joint residence. The jury found true special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)), murder (of Cimmino) in the commission of attempted rape (§ 190.2, subd. (a)(17)), and murder (of Pencin) in the commission of burglary (*ibid.*). The jury also found defendant had personally used a knife (§ 12022, subd. (b)) in the murder of Pencin. After a penalty trial, the jury returned a verdict of death. The court denied the motion for modification of the penalty verdict and entered judgment accordingly.[2]

This appeal from the resulting judgment is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

### FACTS

*Guilt Phase Evidence*

*Prosecution*

Debra Cimmino and Diane Pencin, half sisters who shared a Sacramento townhouse, were killed in the early morning hours of Sunday, March 20, 1983. Diane was found the next day in her bedroom, dead of stab wounds and strangulation. Debbie, also strangled, was found in her car, which was parked outside the townhouse. The principal evidence against defendant consisted of his fingerprints inside the townhouse and Debbie's car; pubic and other hairs found at the crime scene that were consistent with defendant's hairs and inconsistent with the victims'; defendant's initial false exculpatory statements to police, including an attempt to manufacture an alibi; and his eventual partial admission to presence at the crimes.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] A previous trial on the same charges produced the same verdicts of guilt and a penalty of death, but this court reversed the judgment because of juror misconduct during the guilt phase of trial. (*People v. Holloway* (1990) 50 Cal.3d 1098, 1103 [269 Cal.Rptr. 530, 790 P.2d 1327].)

At the time of their deaths in 1983, Diane Pencin was 32 years old and Debbie Cimmino was 20. Both were single, Diane having been married and divorced, and they lived alone in the townhouse, which Diane owned. Lorie Cimmino, their mother, and Michael Cimmino, Debbie's father and Diane's stepfather, lived about a block away. A third sister, Janet Williams, also lived in Sacramento, and her 10-year-old daughter, Michelle, visited Diane and Debbie frequently, including on the weekend of their deaths. Diane and Debbie were security conscious, locking their front door even when they were home and setting their burglar alarm at night.

On Saturday, March 19, Michelle Williams, who had spent Friday night at Diane and Debbie's townhouse, helped Debbie wash her car. They cleaned the automobile thoroughly, inside and out, wiping the back window with Windex and the interior surfaces with Armor All. Diane took Michelle home around 3:00 p.m., then went to a movie with Michael Cimmino. Diane dropped Michael off after the film and spoke to him by telephone around 6:00 p.m., saying that instead of having dinner with him as planned, she would rather stay home and watch some videos.

Sherilyn Hoye, a friend of Debbie's, spent around two hours on Saturday, March 19, from 9:00 p.m. to 11:00 p.m., at the townhouse with Debbie, mostly in her bedroom. Debbie, who was wearing beige shorts and a red and white top, had just finished cleaning the bedroom before Hoye's visit. About 11:30 p.m., Lorie Cimmino telephoned the townhouse and spoke with Debbie, who said she had polished her nails and cleaned the townhouse that evening, that she was tired and going to bed, and that Diane was already in bed; Lorie could also hear Diane's voice in the background.

On Sunday, March 20, Hoye and two other friends of Debbie's tried repeatedly to reach Debbie at home by telephone, but no one answered the phone. Debbie's body was discovered in her car, which was parked in a carport next to the townhouse, on the morning of Monday, March 21, by a concerned friend of both sisters who learned Debbie had not shown up at work and could not be reached by telephone. The friend also noticed two newspapers, including a Sunday paper, on the front doorstep. Police were called and dispatched about 10:00 a.m.; the first officer on the scene discovered Diane's body inside the townhouse and saw Debbie's in her car.

Debbie Cimmino's body lay on the backseat of her car, clothed only in a red and white top. Various other items, including a parka, a robe and a blanket, covered the body. Debbie's purse and its contents were scattered on the front passenger floor. On the back floor were a pair of jogging shoes, a pair of socks, jeans, and black panties. Near the victim's feet, a plastic piece of the seat structure was cracked through.

According to the autopsy pathologist, the cause of Debbie's death was manual strangulation. This was shown, inter alia, by petechiae on her eyelids and the whites of her eyes, external marks on her neck, and internal hemorrhaging in her neck and tongue. Though no sperm were detected in swabs taken from Debbie, there was a quarter-inch tear in the skin at the opening of her vagina and adjacent bruising, consistent with sexual assault and inconsistent with ordinary personal hygiene. The pathologist also found defensive wounds and a torn fingernail on Debbie's hands and a bruise on her forearm.

Diane Pencin was found lying on her back on her unmade bed. She was nude, though her mother testified she always slept in a nightgown or long shirt. A bloodstained pillow, a torn pillowcase, and one part of a telephone without its cords lay on the bed as well. Under Diane's body were several identification cards belonging to Debbie. A pair of red panties was tucked between the mattress and the bed frame. Elsewhere in the room were found another piece of the torn pillowcase, this one knotted; the remaining portion of the telephone, also without cords; two knives, one with visible blood on it; a damp bloodstained dishcloth; and blood spots on the wall.

The pathologist opined Diane had died of both stabbing and strangulation. In Diane's case, strangulation was with a ligature, which could have been a straight telephone cord. Ligature strangulation was shown by petechiae, her dark and puffy face, and the pattern of straight, narrow wounds to her neck. Apparent ligature marks were also on her wrists and ankles. Diane had been stabbed with a knife or similar weapon at least five times in the upper abdomen, including wounds to the heart and liver; some of the wounds were apparently aggravated by the weapon having been partially withdrawn and thrust back in at different angles in the same area. There was no physical evidence of sexual assault.

The telephone in the townhouse kitchen was on the floor, missing its flat cord. In the bathroom, several wet towels were lying around the sink, a condition uncharacteristic of Debbie and Diane's housekeeping. Debbie's bedroom disclosed no sign of a struggle, though a knife was found under the pillow. The telephone was in working order. Two telephone cords were later found under the bottom sheet on Debbie's bed: one a flat cord with a small amount of blood on it, the other coiled, with fibers matching those on the floorboard of Debbie's car. The front door to the townhouse was unlocked, and there were no signs of forced entry.

Defendant's latent fingerprints were found on the telephone body and receiver in Diane Pencin's bedroom, as well as on the doorjamb of that room. Defendant's prints were also found at several places on the exterior of Debbie

Cimmino's car (along with latent prints belonging to others, identified and unidentified) and on the interior backseat surface, above the victim's body, with the fingers of the print pointing towards the victim's head, which was on the driver's side of the seat. Three pubic hairs, one combed from Debbie's pubic hair and two found on a robe found in her car, showed characteristics consistent with the microscopic appearance and structure of defendant's pubic hairs but inconsistent with Debbie's. Two scalp hairs the criminalist described as "Negro" were found on a blanket covering Debbie's body; Debbie was excluded as the donor of these hairs, but defendant (who is African-American) could not be excluded. When arrested on March 22, 1983, defendant had several scratches on his abdomen, which he said he had incurred playing handball the previous day.

On Monday, March 21, 1983, in the initial police investigation of the deaths, Debbie Cimmino's friends and mother mentioned defendant as an acquaintance of Debbie's. Officers Hash and Dean contacted defendant that evening. He was cooperative, giving the officers a taped interview and supplying them with fingerprint samples. According to defendant's statement on March 21, he knew Debbie Cimmino from high school, where they had been friends. They corresponded during a period he spent away from Sacramento and on his return renewed their friendship. Defendant was not Debbie's lover, though he would have liked to have been. He had been in Diane and Debbie's townhouse many times, including both bedrooms. Defendant's father lived very close to the townhouse, but defendant himself lived with his mother elsewhere in Sacramento.

In the March 21 interview, defendant said that he spent Saturday night, March 19, with a friend, Robert Cruz, and Cruz's friends, watching television at Cruz's home, drinking (though defendant abstained), and driving around Sacramento. He slept on Cruz's couch from around 4:00 a.m. to 6:30 a.m. Sunday, then Cruz dropped him off at his mother's house around 7:00 a.m., where, after his mother let him in, he slept until about 2:00 p.m. that day.

Questioned late on the night of March 21, Robert Cruz confirmed defendant's alibi, telling officers he had dropped defendant at defendant's mother's house around 8:00 a.m. on Sunday, March 20. The following morning, however, Cruz, troubled, told the detectives he had provided defendant a false alibi at defendant's direction; in fact, he had dropped defendant at his *father's* home, near the crime scene, about *4:00 a.m.* on Sunday. Defendant had called him later that morning and directed that if anyone were to ask, Cruz should say he left defendant at his mother's at 8:00 a.m. After confessing his earlier falsehood, Cruz, at the detectives' direction, made a monitored telephone call to defendant. When Cruz began to ask defendant about the false alibi, defendant cut him off and asked him to come by later so defendant could

"show [him] something." Cruz also contradicted defendant's statement that he did not drink any alcohol Saturday night.

On Tuesday, March 22, detectives detained defendant, who said he was on his way to see them, as he was leaving his house. At the station, defendant was advised of and waived his *Miranda* rights.[3] He now admitted that Cruz had in fact dropped him at his father's home between 3:00 and 4:00 a.m. He also admitted he had been drinking that night with Cruz and his friends, but claimed he was not drunk and was in control of himself. When defendant realized his father was not home, he walked to a nearby Circle K convenience store and telephoned his mother's house for a ride home; defendant, however, also admitted that before Cruz dropped him off he noticed his father's van was not in the driveway. No one answered at his mother's house. He also called a friend who lived in the neighborhood, Lorenzo Chuidian, but got no answer there either. Defendant initially said he thought about calling Debbie, but knew she would be in bed; later he said he *had* called the Pencin-Cimmino home, but no one answered. While at the Circle K, defendant heard a scream and the sound of glass breaking. Afraid that he would be associated with a possible crime because of his proximity, he later told Cruz to say he had dropped defendant off at his mother's house rather than his father's.

Defendant continued, despite extended questioning and confrontation with fingerprint evidence, to insist he had not gone to the townhouse on Sunday morning. Eventually, though, as the detectives purported to begin filling out an arrest report and booking him, defendant admitted he had drunk enough beer and tequila to get drunk, that from his father's he "went over to [Debbie's] house," and that he remembers her "screaming" in the carport. He further said he "think[s]" both women answered the front door, he told them he was stranded, he may have used their telephone, and that although he did not know what happened next, "I remember being in the house. I remember being in the carport. I remember, I remember Debbie screaming." Asked how he stopped her from screaming, defendant said he did not know.

### Defense

Defendant testified in his own behalf, giving a version of events different from either of his statements to police. According to his testimony, defendant and Debbie had become lovers shortly after his return to Sacramento and remained so up until her death. They had made love in her bedroom and in her car. The last time was about a week before Debbie's death, in her bedroom; she was wearing her robe (in which a pubic hair consistent with defendant's was later found). He lied to the police in order to minimize their relationship.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

On the morning of March 20, after drinking and smoking marijuana with Roberto Cruz and his friends, defendant asked Cruz to take him home, but Cruz drove to defendant's father's house instead. About 4:30 a.m., defendant was walking to the Circle K store when he heard a scream. He telephoned Debbie's house, but got no answer. He decided to go to Chuidian's house, but first he looked over a fence into the carport by Diane and Debbie's townhouse to see if Debbie's car was there. It was, with the passenger door open. Defendant hopped the fence and looked in the car, discovering Debbie's body under a pile of clothing in the backseat.

After trying but failing to revive Debbie, defendant testified, he entered the townhouse through the unlocked front door and walked down the hallway to Diane's room, calling her name. After turning on a light and finding Diane's body on her bed, he picked up the phone to call for help, then realized the receiver was not connected to the phone. He tried the kitchen telephone, but its receiver was missing, so he left. He stopped back at the car to confirm what he had seen, then walked home to his mother's house. On the way he stopped at a pay phone and considered calling the police, but decided it was better not to let them know he had been in the vicinity of the crimes at all. Arriving home around 8:00 a.m., he called Cruz and told him to say he had dropped defendant at his mother's house. He lied to the police because he thought it would increase their suspicion of him if he admitted having found the bodies. He told the police, on March 22, that he heard Debbie screaming because by then he knew it had been she who screamed; he had said both women came to the door because "that's how I wanted them to be last time I seen them alive."

The defense also presented evidence of third party culpability. Zelma Cureton, who in 1983 was working as a prostitute in Reno, Nevada, testified that one night in March she encountered two Black men, acquaintances of Cureton's friend Marfield "Sweeper" Davis, who boasted about having killed two women in Sacramento. One man was short and muscular, the other taller; both were wearing trench coats. While in the bar of the Cal-Neva casino, Cureton heard the shorter one say, "She almost got away," and "It's a good thing we took showers afterwards." The taller man did not respond. Later, the men came to Davis's apartment, where Cureton was spending the night. Cureton learned the shorter man was called "Booker" and the taller was "The Frisco Kid." Booker, who was wearing a blood-splattered T-shirt under his coat, said they had killed two half sisters in Sacramento, that the victims "preferred females," that one of them "had the door of the car almost locked" and he "got there just in the nick of time," and that one woman was stabbed while the other was strangled in the bedroom. The Frisco Kid was mostly quiet. The men stayed at Davis's apartment for a day and a half, leaving early Tuesday morning.

Cureton testified she reported the conversations to Detective Soristo of the Reno Police Department on Monday morning. Soristo wrote a report of her information, but she never heard anything more from the Reno or Sacramento police about the matter.

Soristo did not testify, but another Reno Police Department detective, Gary Eubanks, testified that sometime in March 1983 he relayed information the swing shift detectives had received from Cureton to Harry Machen at the Sacramento County Sheriff's Department. Eubanks was asked to follow up and amplify or clarify this "vague" information; he subsequently conveyed to Sacramento the further information, which came from a male informant, that the supposed Sacramento killing involved only one victim, a cocktail waitress. The Sacramento Sheriff's Office then told Eubanks they had resolved their case by an arrest and that no further investigation would be needed in Reno.

Eubanks also testified that he considered Cureton an unreliable informant and that in a recent homicide case she had voluntarily come forward with information later discredited by a suspect's arrest and confession. Another Reno homicide detective testified that in 1990 Cureton had come forward with information on an investigation, but had later admitted lying about it.

In 1991 interviews with a defense investigator, Cureton twice identified photographs of one Izear Bookman as showing the short, muscular man she had known as Booker. In 1983, Izear Bookman lived across the street from the Pencin-Cimmino townhouse. He was interviewed by police in their initial canvass of the neighborhood on Monday, March 21, 1983, about 3:00 p.m.

Traci Bradley and Sherilyn Hoye, both friends of Debbie Cimmino, testified they had seen two or three African-American men across from Diane and Debbie's townhouse, in the period before the killings. Bradley remembered they were wearing trench coats. Bradley, herself African-American, also testified she was Debbie's lover at the time of her death and had been so for several months. They last made love on Friday, March 18, at Debbie's home.

Shari Drago testified she had been defendant's girlfriend in high school, but broke up with him after he left town. Debbie Cimmino later told her that she and defendant had been corresponding and would be seeing each other when defendant returned to Sacramento.

The latent fingerprint of one Lance Reedy was found on the doorjamb of Debbie's bedroom. Reedy's parents had lived nearby in the 1970's.

*Prosecution Rebuttal*

Juanita Seibel testified she was a longtime, close friend of Debbie Cimmino, continuing to Debbie's death. While Debbie typically was physically affectionate with her boyfriends, Seibel observed no such affectionate behavior between Debbie and defendant. About two months before her death, Debbie told Seibel she and defendant were just friends.

In June 1992 (about two weeks before her trial testimony), Zelma Cureton told a district attorney's investigator that the men she met in Reno had arrived on a Friday evening and left on Monday or Tuesday.

*Penalty Phase Evidence*

*Prosecution*

The prosecution introduced evidence of two prior assaults by defendant on women. Linda Carter, who in 1976 lived in the same apartment complex as defendant's family, testified that she awoke one morning that year to find defendant standing in her kitchen. When Carter, angry, ran toward defendant, he hit her in the head with his fist. As they struggled, defendant struck her twice more with a wooden club about a foot long, causing serious wounds to her face and the back of her head. Eventually defendant ran out the front door.

Roxie Bianchi testified that around 7:30 p.m. one evening in 1979, defendant, a childhood friend of her son Greg (who no longer lived in Sacramento with her), unexpectedly visited her at her home. They talked about Greg for a while, and defendant left. He returned later that night, around 9:30 or 10:00 p.m., saying he did not feel well and asking to use her bathroom. Later he said he had a headache, and Bianchi gave him some aspirin. They talked and watched television for a while more in her living room. Finally Bianchi suggested he leave, as it was getting late. As she led defendant to the door, she felt a heavy blow to the back of her head, then a second blow. As she turned, defendant struck her twice more on the head. Bianchi was bleeding profusely and screaming. She exclaimed that defendant was trying to kill her and said she was calling the police. Defendant asked her not to and left. In the hallway, Bianchi found a claw hammer that did not belong to her. In 1980, defendant suffered a conviction for assault with a deadly weapon as a result of this incident.

Finally, a Sacramento police officer testified that, in 1979, he and his partner had detained defendant while investigating a possible warehouse burglary. Defendant, who was inebriated, cursed at the officers, tried to kick

the windows out of their squad car, and kicked the testifying officer in the leg; he was then subdued with Mace and taken to county jail.

*Defense*

Dorothea Holloway, defendant's mother, testified she ran away with Walter Holloway when she was 17 years old. They had four children together, defendant being the eldest. Walter did not provide for his family, had many affairs with other women, and physically abused Dorothea and the children. Defendant, given alcohol by his father, began drinking when he was about 10 years old. Defendant's brother and two sisters testified defendant was a loving and protective brother, that Walter Holloway gave him alcohol and drugs at a young age, that Walter struck defendant and abused Dorothea in front of defendant, and that Walter took defendant, as a youth, to the homes of women with whom he was having affairs.

A former classmate of defendant's testified to defendant's early drug and alcohol use, to Walter Holloway having provided these substances to a group of girls defendant's age, and to Walter's practice of flirting with girls in defendant's peer group in a domineering manner calculated to humiliate his son. Dorothy Walton, with whom Walter had a daughter, similarly testified to seeing Walter take over a conversation defendant was having with girls his age. A local park worker and counselor who knew both defendant and his father confirmed that Walter's philandering was well known in the neighborhood and that Walter was involved with teenage girlfriends of defendant's.

A former neighbor of defendant's, Sylvia Wesner, remembered him as reserved, quiet and inquisitive. At one point, when there was a rash of break-ins in the apartment complex, defendant volunteered to stay up all night watching her apartment. He stood guard for several nights, until Wesner felt the danger had passed.

Psychologist Shawn Johnston, who conducted interviews and testing on defendant, reviewed background reports, and interviewed defendant's family members, opined that Walter Holloway "should have never had children," and that his behavior had a very negative impact on defendant's personality development, causing problems including depression, suppression of intelligence, and impaired impulse control. Johnston noted a "dramatic" increase in defendant's intelligence quotient (from 100 to 112) over the 15 months he had conducted testing while defendant was in county jail. Defendant had begun to crave knowledge and to read books on history, politics and religion.

He expressed the feeling that he had wasted his life by doing bad things and expressed remorse for those he had hurt. He successfully took on responsibilities as a trusty at the jail.[4] Because of this intellectual and psychological growth, Johnston believed, defendant would adjust well to prison if sentenced to life imprisonment without possibility of parole.

A correctional consultant, James Park, described the high security and confined living conditions of a California prisoner serving a life sentence without possibility of parole. In Park's experience, long-term prisoners are in demand for work assignment and can be a stabilizing influence in the prison, and many people who were bad citizens in the outside community become more productive and useful people in the highly structured prison community. Based on his review of defendant's Department of Corrections file and the testimony of the two jail sheriffs who had employed defendant as an inmate worker, defendant would make a very good life prisoner and would contribute positively to the prison community.

DISCUSSION

*Guilt Phase Issues*

I. *Failure to Suppress Admissions in Defendant's March 22 Statement*

In his statement to police on March 22, 1983, defendant admitted he went to the Pencin-Cimmino residence early on the morning of March 20, that he was drunk at the time, that both women answered the door, that he told them he was stranded, that he may have used their telephone, and that all he remembers after that is "Debbie screaming" in the carport. Defendant contends those admissions should have been suppressed as involuntary because they were induced by an implied threat of capital prosecution if he did not admit the killings and a corresponding promise of leniency if he did. We find no such improper threat or promise.

In the March 22 interview, defendant readily admitted that, contrary to his previous day's statement, he was in the neighborhood of the Pencin-Cimmino residence on the morning of the crimes, but denied that he went to the townhouse or saw the victims that morning. He persisted in that denial despite long and vigorous questioning by Sacramento Sheriff's Detectives Michael Hash and Joseph Dean, who repeatedly accused him of lying, confronted him with evidence contrary to his story, and suggested that he

---

[4] Two deputy sheriffs testified defendant had succeeded as an inmate worker while awaiting trial; he had no disciplinary infractions at the jail and was a reliable worker.

may have gone over to the townhouse without malicious intent, just to see Debbie and get a ride home, and that he might have killed Debbie accidentally. Detective Hash warned defendant he was, by denying any involvement, "digging a hole so deep that you're never gonna see your way out of it" and suggested again that defendant went to see Debbie without any intent to harm her, but "something happened," she started struggling, perhaps yelling, and "you got her around the throat. Tried to get her to stop. She wouldn't stop."

Detective Dean then began asking defendant routine booking questions, which Hash interrupted by once more suggesting that the killings may have been accidental but that if defendant did not say so, "with the evidence we got, you're gonna be found guilty." Defendant argued, "Even if it was an accident, it's still murder." Hash said, "No, not really." The exchange continued as follows:

"Hash: *What I'm talking about is I wanta, I want you to understand something. We're talking about a death penalty case here.*

"Holloway: I know.

"Hash: No ifs, ands or buts. *The truth cannot hurt you, if it's known. The longer you sit there and not say anything and you just ride with it, and you're just, you're gone.* [¶] *Was it an accident?*

"Holloway: I didn't kill Deb and Diane." (Italics added.)

Hash again warned defendant that with the evidence they had and were acquiring, "[y]ou're biting the bull for the whole thing," but defendant once more answered, "I didn't do it." The detectives then continued with the booking process, beginning their arrest report and having defendant empty his pockets. Finally, Hash made another appeal:

"Hash: For god's sake man, if you blacked out and you didn't realize what was happening. You lost control of your temper, whatever. . . .

"Holloway: What difference would that make?

"Hash: *It makes a lot of difference. Makes a lot of difference. Difference between someone gone, going over to do something intentionally before you can get that, I'll go over and do this crime. There's a hell of a difference.* [¶] . . . [¶]

"Hash: If that's how it was, Duane, say so. . . .

"Holloway: I didn't say ah . . . I did, I drank more than I said I did." (Italics added.)

Defendant then went on to make the other admissions previously noted.

The trial court denied defendant's suppression motion regarding the challenged admissions in his March 22 statement, finding the statement voluntary: "Defendant made a voluntary, knowing and intelligent *Miranda* Waiver before questioning began. [¶] Although the questioning was extended, it does not appear to the Court from listening to the tape that any psychological impact on defendant was such as to overbear his will to resist . . . . [¶] Defendant sounded relaxed and cooperative. The questioning was not overly aggressive or accusatory. [¶] Again, it appears that defendant was attempting to use the interview as much as the officers."[5]

"The Fourteenth Amendment to the federal Constitution and article I, section 15, of the state Constitution bar the prosecution from using a defendant's involuntary confession. [Citation.] [These provisions] require[] the prosecution to establish, by a preponderance of the evidence, that a defendant's confession was voluntary. . . . [¶] Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession. . . . On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review. [Citations.] In determining whether a confession was voluntary, '[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne.' " (*People v. Massie* (1998) 19 Cal.4th 550, 576 [79 Cal.Rptr.2d 816, 967 P.2d 29].)

Here, there is no dispute as to the historical facts, no claim of physical intimidation or deprivation, and no assertion of coercive tactics other than the contents of the interrogation itself.[6] When detained at his house, defendant was in the process of seeking out the detectives. Aware his alibi had collapsed, he wanted to tell the detectives why he had asked Cruz to lie about his whereabouts. Before being interviewed, defendant was fully advised of his rights and voluntarily waived them; at no point in the challenged portion of the interview did he indicate any reluctance to cooperate with the

---

[5] The court granted the motion as to statements made later, after defendant asked to see an attorney.

[6] In his reply brief defendant suggests his subdued tone on the interview tape "does indeed sound like fear," but does not argue he was afraid of his interrogators as opposed to apprehensive regarding his future; nor does he contend the detectives did or said anything to place him in personal fear of them.

investigation or any desire to end the interview. The only question, which this court must answer independently, is whether the detectives' mention of a possible death penalty and suggestions that defendant would benefit from giving a truthful, mitigated version of the crimes—passages italicized in the transcript quotes reproduced above—constituted implied threats and promises of leniency sufficient to render the subsequent admissions involuntary.

"It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . . Thus, '[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, 'if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible . . . .' " (*People v. Jimenez* (1978) 21 Cal.3d 595, 611–612 [147 Cal.Rptr. 172, 580 P.2d 672], overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 510, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037].)

"Once a suspect has been properly advised of his rights, he may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. . . . Yet in carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. . . . [The police] are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise." (*People v. Andersen* (1980) 101 Cal.App.3d 563, 576 [161 Cal.Rptr. 707].)

We conclude the detectives in this case did not cross the line from proper exhortations to tell the truth into impermissible threats of punishment or promises of leniency. In telling defendant that "[w]e're talking about a death penalty case here," Detective Hash said nothing beyond the obvious, for the crime—the murder of two young women, in their home, with signs of sexual assault—was a clear candidate for capital prosecution. This was not news to

defendant, who responded, "I know." As we have explained, moreover, "a confession will not be invalidated simply because the possibility of a death sentence was discussed beforehand" (*People v. Ray* (1996) 13 Cal.4th 313, 340 [52 Cal.Rptr.2d 296, 914 P.2d 846]), but only where the confession results directly from the threat such punishment will be imposed if the suspect is uncooperative, coupled with a "promise [of] leniency in exchange for the suspect's cooperation" (*ibid.*).

██ Hash's further suggestions that the killings might have been accidental or resulted from an uncontrollable fit of rage during a drunken blackout, and that such circumstances could "make[] a lot of difference," fall far short of being promises of lenient treatment in exchange for cooperation. The detectives did not represent that they, the prosecutor or the court would grant defendant any particular benefit if he told them how the killings happened. To the extent Hash's remarks implied that giving an account involving blackout or accident might help defendant avoid the death penalty, he did no more than tell defendant the benefit that might " 'flow[] naturally from a truthful and honest course of conduct' " (*People v. Jimenez, supra*, 21 Cal.3d at p. 612), for such circumstances can reduce the degree of a homicide or, at the least, serve as arguments for mitigation in the penalty decision. As the appellate court explained in *People v. Andersen, supra*, 101 Cal.App.3d at page 583, "Homicide does possess degrees of culpability, and when evidence of guilt is strong, confession and avoidance is a better defense tactic than denial."

Defendant began the March 22 interview with the intent merely of explaining why he had asked Cruz to provide him with a false alibi. In the course of their interview, the detectives made defendant aware of some of the evidence they possessed against him, particularly fingerprints indicating defendant's recent use of a telephone in the townhouse and recent presence in Debbie Cimmino's car. By beginning the booking process, they also made clear to defendant that his complete denial would not save him from arrest and probable prosecution for the killings. At that point, defendant made limited admissions to his presence at the scene at the time of the crimes, while laying the groundwork for a possible claim of mitigation based on intoxication. As the trial court remarked, "it appears that defendant was attempting to use the interview as much as the officers." The interview in this case is better characterized as a "dialogue or debate between suspect and police in which the police commented on the realities of [his] position and the courses of conduct open to [him]" (*People v. Andersen, supra*, 101 Cal.App.3d at p. 583) than as a coercive interrogation.

The decisions upon which defendant principally relies, *People v. McClary* (1977) 20 Cal.3d 218 [142 Cal.Rptr. 163, 571 P.2d 620] (overruled on other grounds in *People v. Cahill, supra*, 5 Cal.4th at p. 510, fn. 17), *People v.*

*Johnson* (1969) 70 Cal.2d 469 [74 Cal.Rptr. 889, 450 P.2d 265], and *People v. Cahill* (1994) 22 Cal.App.4th 296 [28 Cal.Rptr.2d 1], are all distinguishable factually:

In *People v. McClary*, the officers ignored repeated requests from the 16-year-old suspect for assistance of counsel, falsely told her she would face the death penalty unless she changed her statement, and strongly implied she would be charged only as an accessory if she admitted mere " 'knowledge' " of the murder. (*People v. McClary, supra,* 20 Cal.3d at p. 229 [142 Cal.Rptr. 163, 571 P.2d 620].) Here, we have no such insistent overriding of a defendant's invocation of rights, no false representation regarding the death penalty, and no promise of a particular charge or other particular lenient treatment in exchange for cooperation.

In *People v. Johnson*, the defendant was advised by one interrogator that any information he gave would only be an investigative aid and "was not admissible in court"; another interviewer neglected to include the right to remain silent in his advisements, the defendant was never asked if he waived the right to counsel, and the record did not contain an affirmative showing he agreed to waive any of his rights. (*People v. Johnson, supra,* 70 Cal.2d at p. 474.) No such circumstances are present in this case. At the outset of the taped interview, defendant was fully advised of, and expressly waived, his rights to counsel and against self-incrimination.

Finally, in *People v. Cahill*, the interrogator gave the defendant a detailed but "materially deceptive" (*People v. Cahill, supra,* 22 Cal.App.4th at p. 315) account of the law of homicide. In particular, the detective led the defendant to believe he could avoid a first degree murder charge, in a burglary-murder case, by admitting to an unpremeditated role in the killing. (*Id.* at pp. 306, 314–315.) Here, the detectives gave defendant no such misleading assurances. No specific benefit in terms of lesser charges was promised or even discussed, and Hash's general assertion that the circumstances of a killing could "make[] a lot of difference" to the punishment, while perhaps optimistic, was not materially deceptive.

The line "can be a fine one" (*People v. Thompson* (1990) 50 Cal.3d 134, 169 [266 Cal.Rptr. 309, 785 P.2d 857]) between urging a suspect to tell the truth by factually outlining the benefits that may flow from confessing, which is permissible, and impliedly promising lenient treatment in exchange for a confession, which is not. But considering all the circumstances of this case, we do not believe the detectives crossed that line by mentioning a possible capital charge or suggesting that defendant might benefit in an unspecified manner from giving a truthful, mitigated account of events.

## II. *Lack of Miranda Advisements Prior to March 21 Interview*

Defendant contends he was held in custody during his interview at the police station on Monday, March 21, 1983, and should therefore have received *Miranda* advisements prior to the interview. He also argues the lack of advisements and what he characterizes as the accusatory content of the interview rendered his March 21 statement (consisting primarily of his false alibi) involuntary, and that both that statement and the following day's statement (assertedly a product of the false alibi's collapse) should be suppressed on that ground as well.

Having learned through neighborhood canvassing and contact with the victims' mother that defendant was a possible boyfriend or would-be boyfriend of Debbie and discovering that he was on parole for an assault, Sheriff's Detectives Dean and Hash attempted, on the evening of March 21, to contact defendant through the Sacramento area pa role offices. From a central office, the fact that sheriff's detectives wanted to talk to defendant was relayed to Willard Stinnett, the lone parole agent on duty at the local office where defendant was scheduled that evening for drug and alcohol testing. When defendant arrived about 6:00 p.m., Stinnett handcuffed him to avoid any possible violence, then telephoned the detectives and talked with Dean.

According to Dean, he told Stinnett that he and Hash wanted to talk to defendant and would leave their office for the parole office immediately. He asked if defendant would still be there when they arrived, and Stinnett assured him he would. Stinnett testified he told Dean he had defendant in his office and would remain with him until the detectives got there. Dean said it would take them 15 or 20 minutes and asked if Stinnett would wait; Stinnett said he would. He did not think he told the detectives he had handcuffed defendant. Hash remembers Dean asking Stinnett if there were some way he could delay defendant's testing so he would still be at the parole office when the detectives got there.

Arriving at the parole office, the detectives were surprised to find defendant in handcuffs. According to Hash and Stinnett, Stinnett immediately released defendant at the request or suggestion of one of the detectives; according to Dean, he himself uncuffed defendant, announcing there had been a mistake: they were there only to talk to defendant, not to arrest him.[7]

---

[7] Defendant testified he was left in handcuffs for about 10 minutes after the detectives arrived. He concedes, however, that this court must defer to the trial court's determination that defendant's testimony was not credible and to its factual finding that "when the sheriff officers saw the handcuffs they immediately had them removed." (See *People v. Ochoa* (1998) 19 Cal.4th 353, 401–402 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

The detectives then asked defendant if he knew why they wanted to talk to him; defendant said he thought it was about the death of his friend Debbie, which he had heard about that afternoon. They said they would like him to come to the station for an interview; he could drive himself over or ride with them. Defendant said the friend who had driven him to the parole office could take him to the police station, but the friend, who was waiting in the lobby, said he had somewhere else to be. The detectives then assured defendant he could ride with them and they would get him a ride home when the interview was completed. Defendant agreed.

Defendant was, according to Hash, patted down before entering the detectives' unmarked car. Defendant sat in the backseat, which had no cage or other divider from the front seat area; the backseat's doors and windows could be operated by the occupant in the ordinary way. At the station the detectives took defendant to an interview room, offering him coffee and the use of a restroom before the interview began.

In the ensuing taped interview, a detective told defendant they were looking for the person responsible for the deaths of Debbie and Diane and were collecting as much information as they could about the victims and their associates. The officer stated defendant was not under arrest, that he had volunteered to come down to the station, and he was not handcuffed. Asked if that was correct, defendant responded, "Yeah." The detective further explained defendant was not "per se, the person we feel [is] responsible for the murder," that in talking to him they hoped to "eliminate you as a possible suspect," and that if at some point they believed he was "definitely a suspect, that you are the person we should be focusing on," they would then advise him of his rights. In his suppression hearing testimony, Detective Hash confirmed that at this point in their investigation the police "had no idea who the perpetrator or perpetrators" were, that they treated everyone as a possible suspect, and that their investigation was not focused on defendant.

The detectives questioned defendant, among other things, about his prior offenses, about whether Cruz would confirm his alibi, and about whether he had told Debbie she should have sex with him to "let a real man show her what it's like." The interview ended about 9:00 p.m., after which defendant, at the detectives' request, took a polygraph examination, was photographed, and gave a set of fingerprint exemplars. Another officer drove defendant home about 1:00 a.m.

The trial court, denying defendant's motion to suppress the March 21 statement, found "defendant was not in custody, was not illegally detained, was not otherwise deprived of his freedom of action in any significant way, and his statements on that date were made voluntarily. A *Miranda* warning

was not required." The court specifically found that "the sheriff officers did not direct or otherwise request that [defendant] be handcuffed by the parole officer" and that "when the sheriff officers saw the handcuffs they immediately had them removed." Further, "the objective indicia of an arrest were not present . . . [as] defendant could have been driven to the police station by his friend, if his friend had been willing to take him," and defendant was assured of, and actually given, a ride home after the interview. Finally, the officers "had not focused on defendant as a suspect . . . [and] were merely gathering information and making an investigation," and "[t]he tape shows that the interview was not confrontational." The court concluded that defendant accompanied the detectives to the station and gave them a self-exculpatory statement not because he felt compelled to do so, but "because he thought it was in his best interest" to do so.

■ On both the questions of custody and voluntariness of the statement, we review the trial court's findings of historical fact under the deferential substantial evidence standard, but decide the ultimate constitutional question independently. (*People v. Ochoa, supra*, 19 Cal.4th at pp. 401–402; *People v. Massie, supra*, 19 Cal.4th at p. 576.) Taking the custody question first, we conclude the circumstances of the March 21 interview did not create any restraint on defendant's movement of the degree associated with a formal arrest; a reasonable person in defendant's circumstances would not have felt compelled to accompany the detectives to the station for an interview or to remain there once the interview began. (*People v. Ochoa, supra*, at p. 402.)

The undisputed facts are that the detectives did not themselves arrest or physically restrain defendant, that they requested he come to the station for an interview but did not demand that he accompany them, and that at the interview's outset they confirmed with him that he was being interviewed voluntarily and told him he was not under arrest or the focus of their suspicion. Substantial evidence, in the testimony of the detectives and the parole officer, supports the trial court's findings that the detectives did not ask for defendant to be handcuffed and did have him released as soon as they arrived, as well as the findings that defendant was told he could have his friend drive him to the station if he liked and that he was promised, and given, a ride home after the interview. This set of facts is objectively inconsistent with a degree of restraint equivalent to arrest; no reasonable person would believe under these circumstances that he was compelled to accompany the officers or to remain with them during the interview.

Defendant argues that as a parolee he would reasonably consider himself a target for suspicion in the deaths of his acquaintances Debbie Cimmino and Diane Pencin and would understand his handcuffing by the parole officer as motivated by police suspicion of him and therefore reasonably believe

himself compelled to accompany the detectives and give them an interview. He further argues the detectives' assurance that he was not "per se" a suspect in the killings, and that if he became such they would advise him of his rights, was reasonably calculated only to reinforce the sense of compulsion. In these circumstances, he maintains, any reasonable person, but especially a parolee, would believe that his rights were suspended until he could prove his innocence to the detectives' satisfaction.

We disagree that a reasonable person in defendant's circumstances, whether or not a parolee, would believe, once he had been uncuffed and the detectives had made their request for a station house interview, he was not free to go his own way. If the detectives intended to keep him in custody until he answered their questions satisfactorily, a reasonable person would assume, they would have left him handcuffed and demanded he ride to the station in their car. Nor was the advisement that defendant was not "per se" a focus of suspicion, that police hoped to rule him out, and that he would be told if he became a suspect, calculated to make a reasonable person think he was not free to leave. Rather, a reasonable person would understand the advisement as indicating an opportunity to be cleared, at the early stages of an investigation, as a possible perpetrator. Defendant apparently so understood it, for he cooperated fully and, without hesitation, proffered the alibi he had fabricated. (See *Oregon v. Mathiason* (1977) 429 U.S. 492, 493–495 [50 L.Ed.2d 714, 97 S.Ct. 711] [where defendant voluntarily came to station house for interview, he was not in custody even though interview took place alone in closed room and officer told defendant he was suspected of crime]; *In re Joseph R.* (1998) 65 Cal.App.4th 954, 956–961 [76 Cal.Rptr.2d 887] [minor suspected of crime, who was advised he did not have to speak with officer, then briefly handcuffed and placed in patrol car while officer conducted another part of investigation, then released from handcuffs and removed from car before being questioned, was not in custody].)

Nor, turning to the voluntariness question, does the combination of temporary restraint by the parole officer and the content of the later questioning support a conclusion that defendant's will was overborne and his exculpatory statement coerced. (*People v. Massie, supra,* 19 Cal.4th at p. 576.) Defendant's words and behavior both indicate he voluntarily accompanied the officers to the station house for an interview, and the detectives' questions regarding his past offenses and his supposed sexual remark to Debbie, even coupled with the acknowledgement he might at some point become a focus of the detectives' suspicions, were not so accusatory or definitive as to convey a threat of arrest if defendant declined to give a statement.

### III. *Effect of this Court's Prior Decision on Custody Determination*

Although, in *People v. Holloway, supra,* 50 Cal.3d at page 1112, we reversed defendant's first conviction for the present crimes on grounds of juror misconduct, in that decision we also addressed the custody issue regarding the March 21 statement because "the issue will arise on retrial" (*ibid.*); we concluded defendant was not in custody (*id.* at p. 1115). The parties dispute whether this portion of our prior decision is law of the case in the present appeal. As the trial court on retrial reached the same conclusion without reliance on that doctrine, and as we now do the same, we need not decide whether the law of the case doctrine applies in these circumstances.

Defendant contends our discussion and conclusion on the custody issue in *People v. Holloway, supra,* 50 Cal.3d at pages 1112–1115, deprived him, in violation of due process principles, of a fair and reliable determination of the issue on retrial, in that it presented the trial court with an irresistible incentive, in order to avoid reversal by this court, to make findings of fact and legal conclusions that accorded with those reflected in our prior decision. The record does not support this claim. The trial court conducted a full hearing on defendant's motion to suppress, at which the testimony of three officers and defendant himself was heard. After written and oral argument, the court ruled, making detailed findings regarding the credibility of the witnesses and the facts surrounding the March 21 interview, and drawing from those facts the conclusion defendant was not in custody at the time of that interview. We reject defendant's claim as entirely speculative, for he cites nothing, and we have found nothing in the record, suggesting the trial court's findings or decision were influenced by our prior decision.

Citing some purported differences between the detectives' testimony in the first suppression motion hearing and that conducted on retrial, defendant also argues our prior discussion of the custody issue may have improperly influenced the testimony itself. Again, nothing in the record suggests such an effect. For a witness to testify somewhat differently on the same topic at sequential hearings is not uncommon. The remedy for a litigant who believes a witness is trying to "improve" his or her testimony is, of course, to question the witness about and, if necessary, impeach the witness with the prior testimony. (See Evid. Code, §§ 770, 780, subd. (h), 1235.) Defendant, who had a full opportunity to cross-examine the prosecution witnesses at the retrial suppression hearing, was not denied due process by any changes in their testimony.

## IV. *Failure to Discharge Juror During Trial*

During the guilt trial, Juror No. 3 three times asked, through the bailiff, if the jury could see photographs of the two victims while alive. After the third request, the juror was asked to appear before court and counsel, outside the presence of the other jurors. Asked by the court his reason for wanting such photographs, the juror responded, "It's just because dreams and stuff. I have no faces to put on the girls. All I have is just blackened after she had been strangled, and the other one I have never seen her face because it's in the back of the seat." On further questioning, he explained that he had "had a few dreams since this trial started, and like I said, I have two girls without faces that are in there," and "just for my own peace of mind" he wanted "something to put together" with the testimony about the victims and the crime scene and autopsy photos.

The juror denied the dreams had any "adverse effect" on him, that he had any question whether he might be acquainted with the victims, or that the lack of live photos would have "any bearing which way I would vote or anything else." He agreed with the court's characterization of his desire as one for "completion of the entire picture involving this case." The court told the juror, "I would assume that you haven't discussed this desire on your part with any of the other jurors," to which the juror answered, "No," but the court did not at that time expressly instruct him not to do so.

After this first interview, the prosecutor noted that he did have photographs of both victims when alive, but was not sure he would be offering them in evidence. The court said that all it could do was "to rule upon the admissibility at the time it arises." Defense counsel made no comment and did not seek to discharge the juror. With agreement of both counsel, the court then instructed the entire jury that only evidence that is relevant and admissible under the Evidence Code could be presented to them; that the evidence is presented by the parties, subject to rulings by the court; and that in their eventual deliberations the jurors were not to discuss matters that had not been introduced into evidence.

During the next court session, an alternate juror revealed that after his interview with court and counsel, Juror No. 3 had mentioned his request to her, saying, "I thought it was a reasonable request." No other jurors or alternates were present, and the alternate ended the conversation by saying, "I think that would have to be submitted as evidence," and walking away. Outside the alternate's presence, the prosecutor remarked that even if Juror No. 3 had not been expressly admonished not to discuss the subject with other jurors, such a prohibition was implied by the court's question at the end of the first interview. Defense counsel agreed, "One might have thought that would be implicit, but evidently not."

Again questioned by the court, Juror No. 3 said he understood he was not supposed to talk about the case with other jurors. He apologized, denied he was dissatisfied with the court's previous ruling and instructions, and explained that after his first interview, "they asked me what I had asked for, and I just mentioned that I had asked to see pictures of the girls. I didn't figure that was talking about it or anything else." The court asked the juror whether "even though we may not . . . satisfy that desire on your part, whether you could put that out of your mind and still be a fair juror in this case and not let that affect you in any way in your decision making." The juror responded, "Yes." Asked whether he had discussed his request with many of the jurors, Juror No. 3 said "it was three or four of them standing there when they asked me what I had come in for. I mentioned that I had asked to see pictures. It wasn't no discussion on it." He said he now understood he should "[s]ay nothing."

After Juror No. 3 left, defense counsel did not move for his discharge or make any comment on the just completed interview. When the entire jury reentered, the court, without any objection, admonished all of them that if, during trial, "it is necessary that the Court occasionally talk to an individual juror" alone, "please don't ask that particular juror what it is that he or she is sharing with us at that point. That would be talking about this case, and it's something that you're not to."

■ Defendant contends the trial court abused its discretion and deprived him of his Sixth Amendment right to an impartial jury in failing to discharge Juror No. 3 after the second interview. We conclude, however, that defendant forfeited this issue by failing to seek the juror's excusal or otherwise object to the court's course of action. (*People v. Majors* (1998) 18 Cal.4th 385, 428 [75 Cal.Rptr.2d 684, 956 P.2d 1137]; *People v. Gallego* (1990) 52 Cal.3d 115, 188 [276 Cal.Rptr. 679, 802 P.2d 169]; *People v. McIntyre* (1981) 115 Cal.App.3d 899, 906 [176 Cal.Rptr. 3]; *People v. Wilson* (1965) 235 Cal.App.2d 266, 281 [45 Cal.Rptr. 267].) "[H]ad [defendant] made the request at this time [after the juror was examined] when there was a suggestion of misconduct on the record, the court could have formally ruled on the matter . . . and cured the problem," if any, by excusing the juror and substituting an alternate. (*People v. McIntyre, supra,* at p. 906.) Having expressed no desire to have the juror discharged at the time, and indeed no concern the juror had engaged in prejudicial misconduct, defendant "is not privileged to make that argument now for the first time on appeal." (*Ibid.*)

■ Nor does the record establish the court abused its discretion or deprived defendant of an impartial jury by leaving Juror No. 3 on the panel. (See § 1089 [juror may be discharged if "unable to perform his or her duty"].) The trial court's decision whether or not to discharge a juror

under section 1089 is reviewed for abuse of discretion and will be upheld if supported by substantial evidence; to warrant discharge, the juror's bias or other disability must appear in the record as a demonstrable reality. (*People v. Marshall* (1996) 13 Cal.4th 799, 843 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; *People v. Lucas* (1995) 12 Cal.4th 415, 489 [48 Cal.Rptr.2d 525, 907 P.2d 373].) A juror's misconduct creates a rebuttable presumption of prejudice, but reversal is required only if there is a substantial likelihood one or more jurors were improperly influenced by bias. (*In re Hitchings* (1993) 6 Cal.4th 97, 118–119 [24 Cal.Rptr.2d 74, 860 P.2d 466]; *People v. Marshall* (1990) 50 Cal.3d 907, 950–951 [269 Cal.Rptr. 269, 790 P.2d 676].)

Defendant does not contend the juror's experience of dreams about the victims, in itself, made him unable to serve; rather, he argues the juror exhibited two forms of misconduct: "First, in discussing the case with [the alternate juror], he violated his oath and the admonition not to so do. . . . Second[], [Juror No. 3] attempted to conceal his misconduct by asserting, completely contrary to [the alternate's] representation, that he did not approach anyone about this, but was asked himself." This misconduct, defendant asserts, demonstrates the juror's bias against him.

True, the jurors were several times admonished not to discuss "this case" with outsiders or, until beginning deliberations, even among themselves; Juror No. 3 was further impliedly told, in the first interview, not to discuss his desire for live pictures of the victims with other jurors. But the juror indicated, in his second interview, that he had not thought answering the other jurors' question about the reason for his first interview violated these admonitions because he did not see answering the question as "talking about" or "discuss[ing]" these matters. There was then the following exchange:

"THE COURT: Okay. Fine. They ask you why I brought you in this morning, don't discuss—

"JUROR [NO. 3]: Say nothing.

"THE COURT: Okay. All right. And I think I'll cover that generally speaking when I bring in the rest of the jurors on that subject." As previously noted, the court did then admonish the entire jury not to ask about or discuss the subject of any interview an individual juror might have with court and counsel.

The trial court, with an opportunity to observe the juror's demeanor, could reasonably have believed from this sequence of events that no deliberate disobedience to its admonitions had occurred and that its more specific admonition after the second interview would prevent any further misunderstanding. Counsel were apparently also of that view, as they made no suggestion that any deliberate misconduct had occurred.

Nor was it clear that Juror No. 3 was misrepresenting or concealing events in indicating that he had responded to other jurors' queries about his first interview. While the alternate juror had said no other jurors were present when Juror No. 3 remarked to her, "I thought it was a reasonable request," it is possible that remark followed the interchange with other jurors that Juror No. 3 recounted. The two accounts, therefore, are not necessarily inconsistent.

From the transcript, it appears Juror No. 3 might have been somewhat frustrated at the prospect that his request would go unanswered and at the court's insistence that he not talk about it. The court probed his feelings in that regard to see if they were so strong as to interfere with his ability to serve, asking whether Juror No. 3 could still "be a fair juror in this case and not let that affect you in any way in your decision making." The juror responded affirmatively, and the court, which, again, had the opportunity to observe his tone and demeanor, was apparently satisfied with that response. Again, the attorneys—who were also present and observed the juror— apparently also were not concerned that Juror No. 3 might be too resentful to serve impartially, as none of them suggested such a possibility to the court.

In sum, substantial evidence supports the trial court's implicit determination that Juror No. 3 was still able to serve impartially as a juror, and no inability appears as a demonstrable reality in the record; the court's failure to discharge him was therefore not an abuse of discretion. As to reversal for juror misconduct, the record does not reflect a substantial likelihood the juror was influenced by bias against defendant; we have no basis to conclude, therefore, that defendant was denied his Sixth Amendment right to an impartial jury.

## V. *Inadequate Examination of Juror*

Defendant contends the trial court conducted an inadequate examination of Juror No. 3 in the first and second interviews. In particular, he claims the court failed to inquire into the possibility that the juror's desire to see photographs of the victims while alive reflected such sympathy for the victims as to constitute, or cause, a bias against defendant. As with the previous claim, however, defendant has waived this claim by his failure to seek a more extensive or broader inquiry of the juror at the time, or in any other way to object to the trial court's course of action. The trial court did not indicate any unwillingness to ask further questions of Juror No. 3; nor did the court preclude counsel from asking such questions; indeed, at the end of the first interview, the court invited questions from counsel, but defense counsel declined. Having failed to suggest any additional examination was required,

thereby preventing the trial court from considering any arguments for conducting further examination, defendant "is not privileged to make the argument now for the first time on appeal." (*People v. McIntyre, supra,* 115 Cal.App.3d at p. 906.)

On the merits, we find no abuse of discretion (*People v. Ray, supra,* 13 Cal.4th at p. 343) in the trial court's failure to inquire further into possible bias. Neither interview gave the court reason not to accept as true Juror No. 3's explanation that he wanted the pictures for, in the court's word, "completion," or to doubt the juror's assurances that his ability to serve as a juror would not be affected by whether the court granted his request and that he could put the matter out of his mind and be a "fair" juror. One may assume the juror felt considerable sympathy for the victims—young women, murdered in an apparently unprovoked attack, leaving behind loving friends and family—but such sympathy does not equal or imply a disqualifying bias against the defense, especially where the defendant claims to be innocent of the crime. The court, which was able to observe the juror's tone and demeanor, conducted an inquiry adequate to determine that Juror No. 3's natural sympathy for the victims had not developed into an emotional involvement so intense and gripping as to disable him from serving impartially.

## VI. *Refusal to Redact Asserted Character Evidence from March 22 Statement*

During the March 22 interview, before defendant admitted having been intoxicated on the night of the killings, Detective Hash asked him whether he blacked out at any point. The following exchange ensued:

"Holloway: I knew what I was doing. I wasn't drunk. Usually I can drink a beer and not, you know, really get drunk. As far as hard liquor, I don't really mess with that, because I know, you know, if I do get drunk that's—Just can't handle hard liquor. That's why I only took one shot of Tequila. 'Cause I know what I'm capable of doing if I'm drunk, if I'm—

"Hash: What is that?

"Holloway: Staggering drunk. Can hurt somebody or whatever. If I was drunk I don't think I could do this.

"Hash: Do what, exactly?

"Holloway: Well, killing. Debbie was too close to me."

Defendant moved for the redaction of most of this passage, beginning after his statement that he does not "really mess with that." Defense counsel argued that defendant's admission he could "hurt somebody" when very drunk was a reference, "in essence," to his prior conviction for assault on Roxie Bianchi, which the guilt phase jury was not to hear about. The prosecutor argued defendant's admission contained no such reference, and the court agreed, stating the remark "does not implicate his prior record."

On appeal, defendant has shifted ground, claiming not that the remark at issue referred to his prior offense, but rather that it was an *opinion* about "his own character for violence while intoxicated" and was inadmissible, under Evidence Code section 1101, to show he acted in accord with that propensity by killing Debbie and Diane while intoxicated on the morning of March 20, 1983.

Although prior instances of conduct and opinion of a witness can both serve to show character (Evid. Code, § 1100), defense counsel did not make clear below that the objection was based on use of the statement as character evidence in violation of Evidence Code section 1101. Rather, counsel argued only that introduction of the remark would tend to make the jury think defendant had been violent in the past and to speculate about "what exactly happened, you know, was he arrested, did he get in trouble." The court held simply that the remark did not tend to raise the subject of defendant's criminal record, a conclusion defendant does not challenge on appeal. Whether counsel sufficiently stated "the specific ground of the objection" (Evid. Code, § 353, subd. (a)) is thus unclear.

■ Even assuming, however, that defendant did preserve his Evidence Code section 1101 objection and that the challenged statement was inadmissible as an opinion about his character, we cannot conclude its admission caused a miscarriage of justice (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b)) or rendered defendant's trial so "fundamentally unfair" (*People v. Falsetta* (1999) 21 Cal.4th 903, 913 [89 Cal.Rptr.2d 847, 986 P.2d 182]) as to constitute a deprivation of due process. Defendant's remark was in substance a frank admission of his own dangerous tendencies. Defendant's personal evaluation of his own character—unsolicited by the detectives, who had not asked defendant whether he lost control when intoxicated—was far more reliable than typical third party opinion-of-character evidence. The prosecution's use of defendant's freely offered assessment of his own weakness did not offend fundamental notions of fair trial. Nor, given the other strong evidence against defendant, including his earlier attempt at creating a false alibi and his later admissions to being present during the killings, taken

with the impeachment of his third-party-culpability witness,[8] can we conclude a different verdict was reasonably probable (*People v. Watson* (1956) 46 Cal.2d 818, 835 [299 P.2d 243]) had the March 22 statement been redacted to omit defendant's admission he could hurt people when intoxicated.

## VII. *Witness's Invocation of Fifth Amendment Privilege*

As noted in the statement of facts, a latent fingerprint belonging to Lance Reedy was found in the townhouse. Other than his parents' ownership of a home nearby, no evidence was introduced of a connection between Reedy and the victims. Appearing with counsel, outside the presence of the jury, Reedy successfully invoked his constitutional privilege against self-incrimination when asked whether he knew the victims, killed them, or lived in his parents' house at the time of the killings. Defense counsel nonetheless called Reedy as a witness, but asked only questions calling for identifying information.

Although defendant did not seek at trial to have Reedy invoke his Fifth Amendment privilege before the jury—defense counsel thrice conceded such a procedure was improper—he now contends the trial court erred in "denying" the opportunity to have Reedy do so. Defendant claims his waiver should be excused because any objection to the procedure actually employed would have been futile in light of existing California law (Evid. Code, § 913; *People v. Mincey* (1992) 2 Cal.4th 408, 441 [6 Cal.Rptr.2d 822, 827 P.2d 388] (*Mincey*)) establishing a criminal defendant is not entitled to compel a witness to invoke the privilege before the jury. He further argues that *Mincey* was incorrectly decided and its application here deprived him of his right, under the Sixth, Eighth and Fourteenth Amendments to the federal Constitution, to present a defense.

We disagree both as to waiver and on the merits. In practically the same breath as he asks us to overrule *Mincey*, defendant argues he did not forfeit the issue below because "counsel could not be expected to lodge an objection on the expectation that this Court would change the rule it pronounced in *Mincey*." To the contrary, we believe that if defendant wanted to preserve his claim that application of the *Mincey* rule deprived him of his constitutional rights, he was required to object, in some form, to application of that rule in the trial court. (See Evid. Code, § 354, subd. (a); *People v. Livaditis* (1992) 2 Cal.4th 759, 778 [9 Cal.Rptr.2d 72, 831 P.2d 297].) Defense counsel in no

---

[8] Defendant argues that although Zelma Cureton's personal credibility was impeached, she was nonetheless believable because the killings she testified to hearing about in Reno bore certain circumstantial resemblances to the Pencin-Cimmino killings. No evidence at trial, however, corroborated Cureton's claim that she reported such circumstantial details to the Reno police; the possibility of later fabrication was thus left open.

way requested that Reedy be forced to invoke his privilege before the jury, nor does defendant claim the trial court had a sua sponte duty to have Reedy do so. This court could not, therefore, reverse the judgment on the ground of any trial court error, even were we to hold that a defendant is entitled to have the jury hear a witness invoke the privilege.

In any event, we do not so hold; instead, we reaffirm the rule expressed in *Mincey*, which follows necessarily and directly from our Evidence Code. Evidence Code section 913, subdivision (a) provides: "If in the instant proceeding or on a prior occasion a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding." Subdivision (b) of the same statute provides that the court, on a party's request, is to instruct the jury not to make any inference from the witness's exercise of a privilege.

In *People v. Frierson* (1991) 53 Cal.3d 730, 743 [280 Cal.Rptr. 440, 808 P.2d 1197], we noted that in light of Evidence Code section 913, to put a witness on the stand for the purpose of having the witness invoke the privilege against self-incrimination "would only invite the jury to make an improper inference." In *Mincey*, we reiterated this reasoning, holding that having the witness exercise her privilege in the jury's presence would be "in direct violation of Evidence Code section 913. The court's refusal to do so was therefore proper." (*Mincey, supra,* 2 Cal.4th at p. 441.) We also rejected the argument that refusing to do so deprived the defendant of his right to present a defense, observing that a person may invoke the privilege for reasons other than guilt, and "[a] defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference." (*Id.* at p. 442; accord, *People v. Hill* (1993) 3 Cal.4th 959, 991–992 [13 Cal.Rptr.2d 475, 839 P.2d 984], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].)

Although Evidence Code section 913 applies equally in civil litigation as in criminal prosecutions, defendant suggests that case law in civil cases has nonetheless allowed comment to be made on and inferences to be drawn from a witness's invocation of the privilege against self-incrimination. From that premise he argues that if such inferences are permitted in civil cases, so must they be in criminal cases where the witness is not the defendant, but a third party who is not facing immediate criminal sanction. The probative value of an invocation, defendant argues, "does not change because the proceeding is denominated criminal or civil."

■ Defendant's argument founders on its premise that California evidence law differs in this respect between civil and criminal litigation. The only decision he cites on this point is *Shepherd v. Superior Court* (1976) 17 Cal.3d 107 [130 Cal.Rptr. 257, 550 P.2d 161].[9] We did say in that case that "[w]hen a claim of privilege made on this ground in a civil proceeding logically gives rise to an inference which is relevant to the issues involved, the trier of fact may properly draw that inference." (*Id.* at p. 117.) We based that statement on a pre-Evidence Code decision, *Nelson v. Southern Pacific Co.* (1937) 8 Cal.2d 648 [67 P.2d 682], and on an earlier case upon which *Nelson* itself relied. In *Shepherd v. Superior Court*, however, we failed to observe that the 1965 enactment of Evidence Code section 913—prohibiting the drawing of adverse inferences in criminal and civil cases alike—had abrogated the holding in *Nelson*. As stated in the official comment accompanying the section's enactment as part of the new Evidence Code (see Cal. Law Revision Com. Rep. (Jan. 1995) reprinted at 29B pt. 1 West's Ann. Evid. Code (1995 ed.) p. XXXIX et seq.), "Section 913 [w]ill, in effect, overrule the holding in the *Nelson* case, for it declares that no inference may be drawn from an exercise of a privilege either on the issue of credibility or on any other issue, whether the privilege was exercised in the instant proceeding or on a prior occasion. The status of the rule in the *Nelson* case has been in doubt because of the recent holdings in criminal cases; *Section 913 eliminates any remaining basis for applying a different rule in civil cases.*" (Assem. Com. on Judiciary com. on 1965 Evid. Code, 29B pt. 3 West's Ann. Evid. Code, *supra*, foll. § 913, p. 168, italics added.) In light of the intervening enactment, our decision in *Shepherd v. Superior Court, supra*, 17 Cal.3d 107, erred in repeating the rule of *Nelson* and is overruled to that extent.

California law, then, makes no distinction between civil and criminal litigation concerning adverse inferences from a witness's invocation of the privilege against self-incrimination; under Evidence Code section 913, juries are forbidden to make such inferences in both types of cases. (*In re Scott* (2003) 29 Cal.4th 783, 815–816 [129 Cal.Rptr.2d 605, 61 P.3d 402].) No purpose is served, therefore, in either type of trial by forcing a witness to exercise the privilege on the stand in the jury's presence, for, as we observed in *Mincey, supra*, 2 Cal.4th at page 442, the court would then be "required, on request, to instruct the jury not to draw the very inference [the party calling the witness] sought to present to the jury. (Evid. Code, § 913, subd. (b).)" We reject defendant's contention, founded on the misconception that inferences from exercise of the privilege are deemed valuable and

---

[9] Defendant cites three federal decisions for the proposition that the Fifth Amendment to the federal Constitution does not prohibit adverse inferences from the invocation of the privilege against self-incrimination against parties to civil litigation. That proposition says nothing about whether the *California* law of evidence sanctions such inferences.

permissible in civil cases, that such inferences must also be permitted to be raised by a criminal defendant.

## VIII. *Limiting Instructions on Evidence of Homosexuality*

The court, at the urging of the defense and over prosecution objection, admitted evidence that Debbie Cimmino had a homosexual relationship with Traci Bradley and that defendant was aware she was lesbian or bisexual. The court, without objection from either party, instructed the jury to consider such evidence only for limited purposes. Defendant now contends those instructions were improper restrictions on the use of relevant evidence. We conclude defendant waived his objection by failure to make it properly below and that giving limiting instructions was within the trial court's discretion.

In a motion in limine, defendant argued evidence of Debbie's sexual orientation was relevant to show that one of her lovers, Bradley, could have contributed pubic hairs found at the scene; to impeach Lori Cimmino's expected testimony that she was close to her daughters and thus knew their lifestyle and habits (in particular their cleanliness and neatness); and generally to "help paint a complete portrait" of Debbie. The prosecution disputed the evidence's relevance, asserting the defense simply wanted to "sully up Debbie Cimmino in a collateral way." The court ruled Bradley would be permitted to testify to her sexual relationship with Debbie for the limited purpose of explaining the hair evidence, but precluded additional evidence on the subject and its use to impeach Lori Cimmino. The court explained that while "we do not discriminate in the law" on the basis of sexual orientation, "I cannot be blind when I'm considering possible prejudice of the feelings of some people in society." The court stressed its ruling limiting use of the evidence was tentative, as it had not yet heard any evidence, and "counsel is free at any time to approach the bench and ask me to change the ruling based upon [the] evidence at that time."

During his March 22 interview with the detectives, defendant was asked how he felt about Debbie "being a lesbian." He replied he was not happy about it, but that was Debbie's own personal life. Before the tape of that interview was played for the jury, the court ruled, as the defense requested, that this exchange would be included only for the limited purpose of showing "the defendant's state of mind at the time." Defense counsel did not object to that limitation on admission. The court subsequently instructed the jury the exchange was not to be considered for the truth of Debbie's sexual orientation, but only to aid in understanding defendant's further recorded statements and his state of mind concerning his relationship with Debbie at the time of the interview.

Similarly, after Traci Bradley testified to her sexual relationship with Debbie, the court instructed the jury that the testimony was admitted only "for the limited purpose of considering it in connection with the physical evidence found at the scene of the homicide." Again, defense counsel raised no objection to this limiting instruction.

On appeal, defendant contends the evidence of Debbie's sexual orientation was not subject to any limitation on its use; hence, no limiting instruction was appropriate. He asserts that in addition to the two uses permitted by the court's instructions (to show defendant's state of mind during the March 22 interview and in connection with the hair evidence), the evidence was relevant to buttress the credibility of Zelma Cureton's testimony (Cureton testified "Booker" said the victims were lesbians) and to show a "venturesomeness" on Debbie's part consistent with her being defendant's lover (as he testified she was) or opening her door late at night to Izear Bookman, whom the defense contended might be the real killer.

Neither of these bases of relevance was raised or discussed in the hearing on defendant's motion in limine, nor did defendant take advantage of the trial court's offer to reconsider its in limine ruling at any point during trial. A tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1047 [90 Cal.Rptr.2d 607, 988 P.2d 531]; *People v. Morris* (1991) 53 Cal.3d 152, 189–190 [279 Cal.Rptr. 720, 807 P.2d 949], overruled on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal. Rptr. 2d 394, 889 P.2d 588].) " ' "Where the court rejects evidence temporarily or withholds a decision as to its admissibility, the party desiring to introduce the evidence should renew his offer, or call the court's attention to the fact that a definite decision is desired." ' " (*People v. Moore* (1954) 43 Cal.2d 517, 523 [275 P.2d 485].) If defendant wished to use the evidence of sexual orientation to support his third party culpability defense or (in an odd fashion) to buttress his testimony that he and Debbie were lovers, he could and should have presented those theories to the trial court, which could, if it agreed the evidence was relevant for those purposes, have revised its limiting instructions or given the jury a new instruction permitting wider consideration of the evidence.

On the merits, the court did not abuse its discretion in instructing on limited use of the evidence. As defendant concedes, where evidence is inadmissible simply to show a person's character but is admitted on some other proper ground, the court may protect against the jurors' possible misuse of the evidence through a limiting instruction. (See Evid. Code, § 355.)

Here, the court feared the evidence might be misused by one or more jurors as evidence of Debbie's character and as such might be prejudicial and distracting because of possible personal bias against homosexuals. We cannot conclude the trial court, which knew the jurors and the community from which they were drawn, was unreasonable in its apprehension or in its choice of remedy.

### IX. *Exclusion of Evidence of an Obscene Telephone Message*

Defendant contends the trial court erred in excluding testimony from Debbie Cimmino's friend Juanita Seibel that a few weeks before the killings, Seibel had heard an obscene telephone message left on one of the victims' telephone answering machines. We conclude the court did not abuse its discretion in excluding Seibel's testimony under Evidence Code section 352.

In an offer of proof outside the jury's presence, Seibel testified that about three weeks or a month before the killings, Debbie had played for her a message from an answering machine. The recording was of a male voice Seibel did not recognize. Other than that the message was "obscene" and "sexually disgusting," Seibel did not recall its contents. She did not recall either sister's name being used in the message and did not know on which machine it had been recorded or to whom it was directed.[10]

The trial court sustained the prosecution's objection to this testimony, ruling that "[i]f this evidence is relevant, it is extremely speculative. And if it has any probative value at all, its probative value is substantially outweighed by a substantial danger of confusing the issues and misleading the jury."

 Exclusion of evidence as more prejudicial, confusing or distracting than probative, under Evidence Code section 352, is reviewed for abuse of discretion. (*People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897].) Defendant asserts the evidence would have supported an inference that Izear Bookman left the obscene message, but as Seibel did not recognize the caller's voice and recalled almost nothing of the message's contents, any such inference would have been entirely speculative. Though Zelma Cureton identified a photograph of Bookman as the man "Booker" who boasted of having killed two women in Sacramento, no evidence linked Bookman to a telephone message left several weeks earlier. On the other side of the scale, testimony about an obscene message from an unknown caller had substantial potential to distract the jury from the issues presented by the

---

[10] Through testimony taken before the jury, defendant proved that the police had inadvertently recorded over a telephone message tape taken from the victims' townhouse, but a detective who remembered listening to this tape before it was recorded over did not recall anything of evidentiary value.

charges and to confuse their understanding of the facts. Its exclusion was within the trial court's discretion.

Nor did the court's ruling, as defendant also claims, deprive him of the Sixth Amendment right to present a defense. As there was no rational basis for an inference that Bookman left the message, admission of Seibel's testimony could not have materially bolstered the defense attempt to show Bookman was one of the murderers.

### X. Exclusion of Testimony Regarding Public Disclosure of Victim's Sexual Orientation

Over prosecution objection, Sacramento Sheriff's Lieutenant Ray Biondi was permitted to testify that he made a press statement regarding the Pencin-Cimmino killings but did not release any information regarding the condition of the bathroom. The trial court excluded his further testimony, offered by the defense to support the testimony of Zelma Cureton that she had heard from "Booker" the victims were lesbian, that he also did not say anything to the press about Debbie's homosexuality. The court apparently believed that evidence was irrelevant because "there were people at the scene" who knew of Debbie's sexual orientation and thus Biondi's proposed testimony could not show "he was the only possible source of it."

Any error in excluding the proposed testimony was harmless. It would not have significantly bolstered Cureton's credibility because the defense presented nothing, other than Cureton's own testimony, to show that she had learned any circumstantial details of the crimes—such as that the victims were sisters, and that one or both were lesbian—from the men she met in Reno. Between the weekend of the crime in 1983 and the time of her testimony in 1992, of course, Cureton could have learned of Debbie's sexual orientation in any number of ways. To the extent the jury found Cureton's testimony unbelievable, as they apparently did, it is not reasonably probable their assessment would have been changed by Biondi's offered testimony. (*People v. Watson, supra,* 46 Cal.2d at pp. 835–837.) Nor, for the same reason, was the evidence so significant as to render its exclusion, if error, a deprivation of defendant's constitutional right to present a defense.

### XI. Prosecutorial Misconduct in Argument

In his trial testimony, defendant said he had been drinking beer and tequila and smoking marijuana during the night preceding the killings and was intoxicated at the time he heard a scream originating near the victims' townhouse. At the request of both defense counsel and the prosecutor, the court instructed the jury (using CALJIC No. 8.47) on the lesser included

offense of involuntary manslaughter committed while unconscious as a result of voluntary intoxication. At the prosecutor's request, the court also gave a more general instruction (CALJIC No. 4.21) on voluntary intoxication as it relates to mens rea.

The prosecutor argued to the jury that the crime defendant committed was first degree murder, not any of the lesser included offenses upon which the jury would be instructed. He observed that the jury would be instructed on voluntary intoxication and its relationship to the lesser included offenses, but they should know that "that doesn't exist in this case either. *It exists solely to the extent that the defendant now, now in 1992 wishes to present to you an excuse and that's it, that's all. It's simply a sham.* It's basically a smoke screen by the defendant because he knows just as you know he's been here in the courtroom. He knows all of the evidence that has been presented and how truly damning it is." (Italics added.)

Defendant contends the italicized portion of this argument was an improper attack on defense counsel's integrity, unwarranted because the defense presented at trial was third party culpability, not intoxication, and the prosecutor, rather than defense counsel, had requested instruction on voluntary intoxication as it related to mens rea. The issue was forfeited, however, by the defense's failure to object or seek an admonition. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1333 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Though such an omission may be excused where an objection would have been futile or an admonition could not have cured the harm (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673]), that is not the case here. The trial court said nothing to suggest an objection would have been futile, and even if the remark is considered misconduct it was not so inflammatory or revelatory that a timely admonition could not have been effective. The prosecutor's remark revealed no fact the jury had not already heard and did not address the question of third party culpability upon which the defense was primarily depending. An instruction to disregard the remark could have dissipated whatever prejudice was created.

Nor are we persuaded the prosecutor misconducted himself in the manner defendant contends. Defendant's trial testimony did present the issue of intoxication, an issue even more strongly suggested by the March 22 statement, and while defense counsel did not request the general instruction on the subject, they did request instruction on voluntary intoxication as supporting the lesser included offense of involuntary manslaughter. Although the primary defense was third party culpability, the prosecutor was not without justification in suggesting that defendant was also proffering a fallback defense of unconsciousness due to voluntary intoxication.

XII. *Restriction on Defense Guilt Phase Argument*

Addressing the jury on the subject of Zelma Cureton's testimony, defense counsel argued that its significance was on the question of reasonable doubt. The following exchange then occurred:

"MS. LANGE [defense counsel]: . . . You're going to hear a long description of reasonable doubt, but basically it's defined as that—

"THE COURT: I will give the instruction on reasonable doubt.

"MS. LANGE: Okay. I was going to read the last sentence.

"THE COURT: You read the whole thing or not read it at all.

"MS. LANGE: Okay. The Judge will instruct you on what reasonable doubt, what reasonable doubt is, excuse me."

Counsel then argued Cureton's testimony raised a reasonable doubt as to defendant's guilt.

■ Defendant contends the court abused its discretion and deprived him of his Sixth Amendment right to effective assistance of counsel, by restricting counsel's argument in this manner. We disagree. Counsel was precluded neither from previewing the reasonable doubt instruction nor from arguing the evidence did not prove guilt by that standard. The court barred counsel only from giving an incomplete version of the instruction, including only that part favorable to the defense and omitting that part favorable to the People.[11] Such a limitation was well within the court's discretionary control over argument (§ 1044; *Herring v. New York* (1975) 422 U.S. 853, 862 [45 L.Ed.2d 593, 95 S.Ct. 2550]) and did not preclude counsel from fairly arguing the case against conviction.

XIII. *Sufficiency of Evidence of Burglary*

Defendant contends his burglary conviction and the special circumstance finding that he murdered Diane Pencin in the commission of a burglary must

---

[11] The court's instruction defining reasonable doubt (CALJIC No. 2.90) (1989 rev.) was as follows: "It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

be reversed because the evidence is insufficient to show he entered the Pencin-Cimmino townhouse with the intent to commit rape.

Diane's body was found lying on her back on her bed, nude, but her mother testified that Diane did not sleep in the nude, and defendant told the police both victims, presumably clothed, answered the door when he went to the townhouse. The bedroom was in disarray and a pair of panties was found tucked between the mattress and the bed frame. Diane's wrists and ankles bore ligature marks, and her stab wounds were to the front of her body. Taking this evidence together with the physical evidence indicating an incomplete sexual attack on Debbie Cimmino in the backseat of her car (her partially unclothed body, a vaginal tear, foreign pubic hairs found on her body and on the robe covering it, the location of defendant's palm print above the backseat, and a lack of semen on the body or surrounding items), the Attorney General argues the jury could have rationally inferred defendant tried to rape Debbie in the car but failed and, frustrated, turned his sexually assaultive intent on Diane, entering or reentering the townhouse, removing Diane's nightclothes, tying her up by the wrists and ankles on the bed, and eventually stabbing and strangling her in that position. Defendant, the Attorney General concedes, also entered with the intent of killing Diane to eliminate a witness who could tie him to Debbie's death, but had that been his only intent he would have had no reason to remove Diane's clothing or bind her hands and feet.

We agree with the Attorney General that from this evidence a rational trier of fact could have found beyond a reasonable doubt that defendant entered the townhouse with the intent to sexually assault Diane. (*People v. Rowland, supra*, 4 Cal.4th at p. 271.) As in *People v. Marshall* (1997) 15 Cal.4th 1, 36 [61 Cal.Rptr.2d 84, 931 P.2d 262], evidence of another sexual assault linked to the charged attack, together with the physical evidence surrounding the attack itself, sufficiently supported the finding of sexually assaultive intent.

Defendant relies on three older decisions (*People v. Granados* (1957) 49 Cal.2d 490 [319 P.2d 346]; *People v. Craig* (1957) 49 Cal.2d 313 [316 P.2d 947]; *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942]) in which this court found evidence regarding the condition of female victims' bodies insufficient to support convictions of murder in the commission of rape or child molestation. All these decisions are, by their nature, dependent on the particular facts of the case, and none speaks precisely to the facts here. In *People v. Craig*, we regarded the condition of the defendant's clothing as inconsistent with the prosecution's rape-murder theory (*Craig, supra*, at p. 318); no such inconsistency appears here. In all three decisions, we noted the lack of semen, wounds to the victims' genital area, or both

(*id.* at pp. 317, 319; *People v. Granados, supra,* at p. 497; *People v. Anderson, supra,* at p. 22), factors which, whatever they may show when the charge is murder in the commission of rape or child molestation, have little tendency to rebut an inference this defendant *entered the townhouse* with a sexually assaultive intent. Most important, in none of the cited cases had the assailant, in close connection with the charged offense, also sexually assaulted another woman or child, as the jury could certainly conclude defendant did here.

The cited decisions, as a group, may be read to establish "that the victim's lack of clothing . . . is insufficient to establish specific sexual intent." (*People v. Johnson* (1993) 6 Cal.4th 1, 41 [23 Cal.Rptr.2d 593, 859 P.2d 673].) But the finding in the present case rests on substantially more than the victims' nudity. The closely associated sexual assault on Debbie and the evidence Diane was bound at her wrists and ankles during the attack, in particular, distinguish the cited cases and support the rational inference that defendant entered the townhouse with the intent of raping, as well as killing, Diane.

### XIV. *Incomplete Instructions on Relationship Between Murder and Burglary*

The trial court instructed the jury (through CALJIC No. 8.21) that the killing of Diane Pencin was first degree murder if committed "during the commission of burglary" and (through CALJIC No. 8.81.17) that the burglary-murder special circumstance required proof that the murder was committed "while the defendant was engaged in the commission of a burglary." The court did not, however, instruct with the last portion of CALJIC No. 8.81.17, to the effect that the murder must have been carried out to advance the burglary, and not vice versa (see *People v. Green* (1980) 27 Cal.3d 1, 60–62 [164 Cal.Rptr. 1, 609 P.2d 468], disapproved on other grounds in *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99]); nor was the jury instructed, pursuant to the "merger" principle, that a burglary committed solely with the intent to kill or assault the victim inside the premises may not serve as the predicate for a felony-murder conviction (see *People v. Hansen* (1995) 9 Cal.4th 300, 311–312 [36 Cal.Rptr.2d 609, 885 P.2d 1022]; *People v. Wilson* (1969) 1 Cal.3d 431, 440–441 [82 Cal.Rptr. 494, 462 P.2d 22]).

Defendant contends the instructions were prejudicially incomplete and deprived him of due process under the Fourteenth Amendment to the federal Constitution because, under them, the jury might have improperly rested both the first degree murder conviction for Diane's killing and the associated special-circumstance finding on a theory that defendant had burglarized the

townhouse only with the intent to kill Diane, not to rape her. But we need not decide whether the trial court should, sua sponte, have given specific instructions precluding that theory, for the record establishes that the jury did *not* rely on such a theory of burglary. On the charge of burglary itself, the jury was instructed that burglary was entry into an inhabited dwelling house "with the specific intent to commit rape," and there must be proof that at the time of entry defendant "had the specific intent to commit the crime of rape." This instruction left no room for a theory of burglary with the sole intent to kill, yet the jury convicted defendant of burglary, necessarily finding he entered with the intent to rape, not only to kill, Diane. It follows that the murder and burglary did not merge, for purposes of first degree felony murder, and that the burglary was not merely incidental to the murder for purposes of the special circumstance. Any error in failing to instruct more fully was therefore harmless, even under a federal constitutional standard, because the jurors necessarily resolved the assertedly omitted factual question through other properly given instructions. (*People v. Flood* (1998) 18 Cal.4th 470, 483, 506 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

### XV. *Failure to Instruct on Heat-of-passion Manslaughter*

Turning to his conviction for the murder of Debbie Cimmino, defendant complains that the court, while it gave a general instruction on voluntary manslaughter as a lesser included offense of murder, did not specifically instruct that malice aforethought is negated, and the crime reduced to voluntary manslaughter, when the killer acts in a heat of passion arising from sufficient provocation. (*People v. Breverman* (1998) 19 Cal.4th 142, 163 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) He argues the evidence supported a scenario in which defendant and Debbie began a consensual sexual encounter in Debbie's car, defendant "failed sexually, was ridiculed by Debbie Cimmino," and reacted to that provocation with homicidal rage.

We reject the contention because there was simply no evidence, much less substantial evidence, presented to support the provocation theory. Defendant, who testified regarding his actions on the morning of the killings, stated that when he first saw Debbie that morning she was already dead. Nor did the fragmentary narrative defendant gave police in his March 22 statement include any account of a consensual sexual encounter. The condition of Debbie's body and car indicated a violent struggle and forcible penetration, not a consensual encounter. As no reasonable jury could infer from the evidence as a whole that Debbie Cimmino provoked defendant into killing her, the court did not err, under California law, in failing to instruct on that theory of voluntary manslaughter. (*People v. Breverman, supra,* 19 Cal.4th at p. 162; *People v. Barton* (1995) 12 Cal.4th 186, 194–195, 200–201 [47 Cal.Rptr.2d 569, 906 P.2d 531].)

██ Nor, contrary to defendant's claim, did the trial court deprive defendant of any right under the Eighth or Fourteenth Amendment to the federal Constitution in failing to give instructions consistent with the theory, for no fundamental unfairness or loss of verdict reliability results from the lack of instructions on a lesser included offense that is unsupported by any evidence upon which a reasonable jury could rely. While this court in *People v. Breverman, supra,* 19 Cal.4th at page 170, footnote 19, recently declined to decide whether failure to instruct on a lesser offense of voluntary manslaughter "supported by the evidence" is federal constitutional error (see also *id.* at pp. 189–190 (dis. opn. of Kennard, J.) [arguing failure to instruct violates Constitution "[w]here . . . there is sufficient evidence of heat of passion to support a voluntary manslaughter verdict"]), nothing in either the majority or dissenting *Breverman* opinion suggests that the federal Constitution, any more than the California Constitution, is infringed when a theory of voluntary manslaughter unsupported by any substantial evidence is omitted from the law presented to the jury.

XVI. *Instruction that Voluntary Manslaughter Requires Intent to Kill*

██ Defining the offense of voluntary manslaughter, the court told the jury that one of its elements is the intent to kill. Defendant contends this was error in light of our recent holding in *People v. Lasko* (2000) 23 Cal.4th 101, 104, 108–111 [96 Cal.Rptr.2d 441, 999 P.2d 666] that the mens rea of the offense is also met by proof of a highly dangerous act committed in conscious disregard of human life. A correctly instructed jury, defendant suggests, might have convicted him of heat-of-passion voluntary manslaughter on the theory that defendant, intoxicated and in a "sexual rage such as might reduce murder to manslaughter," strangled Debbie with the intent to hurt her seriously and not caring whether he killed her, but without any actual intent to kill.

As just explained, however (see pt. XV., *ante*), even assuming defendant killed Debbie in a sexual rage rather than to prevent her from reporting his sexual assault on her, the record contains absolutely no evidence of provocation sufficient to cause an ordinarily reasonable person to act in such a rage. Nor was there any evidence defendant intended to hurt, but not to kill, Debbie when he strangled her with his hands. This variation on defendant's appellate theory of voluntary manslaughter therefore also lacks substantial evidentiary support and, for the reasons given above, was error neither under state law nor under the Eighth and Fourteenth Amendments to the federal Constitution.

## XVII. *Instructions on Consciousness of Guilt*

Using three standard instructions (CALJIC Nos. 2.03, 2.04, 2.06), the trial court told the jurors that if they found defendant had made willfully false or deliberately misleading statements about the crimes, or had attempted to fabricate or suppress evidence, they could consider such statements or efforts as tending to show consciousness of guilt. All three instructions also included the cautionary advisement that "such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

 Defendant concedes these instructions were supported by the evidence, but nonetheless contends they are argumentative and fundamentally unfair; they unconstitutionally lighten the prosecution's burden of proof, defendant argues, by "singl[ing] out isolated bits of evidence against [defendant] and magnify[ing] them." As defendant also concedes, we have previously rejected this contention, observing that "[t]he cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; see also *People v. Kelly* (1992) 1 Cal.4th 495, 531 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Defendant's answer, that the cautionary parts would not be needed if the inculpatory inferences were not highlighted by the instructions themselves, does not persuade us the instructions are unfair. The inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction. In this case, such circumstantial evidence of consciousness of guilt was among the strongest evidence against defendant and would certainly have been argued—properly—by the prosecutor even without the challenged instructions. To highlight this circumstantial evidence in the course of cautioning the jury against overreliance on it was not unfair to defendant.

## XVIII. *Cumulative Prejudice of Guilt Phase Errors*

We reject defendant's contention that the errors made in conducting the trial on guilt and special circumstances were prejudicial in combination. We have not found any errors in the conduct of the trial, and in the few instances where we have assumed error for purposes of discussion (see pts. VI., X. & XIV., *ante*) we have not found prejudice or, indeed, any significant adverse impact. Even taken together, therefore, such assumed errors were not prejudicial. (*People v. Price* (1991) 1 Cal.4th 324, 491 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

*Penalty Phase Issues*

### XIX. *Evidence of Prior Violent Act's Impact on Victim*

As described earlier, the prosecution presented evidence, pursuant to section 190.3, factor (b) (hereafter factor (b)), that in 1976 defendant, uninvited, entered the home of a neighbor, Linda Carter, in the early morning and, when discovered by Carter, struck her repeatedly in the face and head with his fist and a wooden club, causing physical injuries for which she received medical treatment. Carter further testified that as a result of the incident she received psychological treatment for fear and bought a handgun, which she still possessed at the time of trial. Over defense objections on the ground of irrelevance, Carter was allowed to further testify that she kept the gun under her pillow and carried it to investigate any noises she heard in the night; without such investigation, she observed, "there is no way I could rest."

Defendant concedes that under factor (b) prior violent acts may be shown "in context," so as to fully illuminate their seriousness (*People v. Melton* (1988) 44 Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741]), but contends the relevant context includes only direct and foreseeable results of the violence, not "remote or idiosyncratic reactions of the victim," a category into which he argues Carter's testimony about her continuing fear falls. For this proposition he relies on *People v. Boyde* (1988) 46 Cal.3d 212, 249 [250 Cal.Rptr. 83, 758 P.2d 25], in which we held irrelevant to the aggravating factors in section 190.3 unspecified "testimony by victims of other offenses about the impact that the event had on their lives." Acknowledging that in *People v. Mickle* (1991) 54 Cal.3d 140 [284 Cal.Rptr. 511, 814 P.2d 290] we held admissible, apparently under factor (b), the testimony of sexual assault victims that "they continued to experience pain, depression, and fear" (*Mickle, supra,* at p. 187),[12] defendant argues the two decisions may be reconciled through the foreseeability rule he proposes. He also contends the same proposed rule must limit admissibility under the Eighth and Fourteenth Amendments to the federal Constitution, for permitting unlimited victim-impact evidence under factor (b) would render that factor unconstitutionally vague and open the way to imposition of the death penalty in an arbitrary and capricious manner.[13]

---

[12] See also *People v. Price, supra,* 1 Cal.4th at page 479 ("At the penalty phase, the prosecution may introduce evidence of the emotional effect of defendant's prior violent criminal acts on the victims of those acts").

[13] But see *People v. Garceau* (1993) 6 Cal.4th 140, 201–202 [24 Cal.Rptr.2d 664, 862 P.2d 664] (federal Constitution does not bar introduction of evidence showing effect of prior violent criminal activity on victims).

■ We need not decide here whether evidence of indirect or idiosyncratic effects of prior criminal violence is irrelevant under factor (b), or its use unconstitutional, for the evidence defendant complains of was neither remote nor unforeseeable. As the Attorney General observes: "[V]ictim Carter's emotional trauma years later, resulting from [defendant's] assault with a deadly weapon that caused severe head injuries, after he surprised this single mother and her child in their apartment, was highly foreseeable. A victim's understandable reaction of arming herself at night and investigating strange noises at night while armed hardly seems unusual or disconnected from her experience as one of [defendant's] victims." Though a number of years had passed between defendant's attack on Carter and her testimony, the link between the attack and the emotions and actions to which Carter testified was direct and foreseeable, not causally remote or unforeseeable. Even under the limitation defendant urges, the evidence was admissible.

### XX. *Prosecutor's Implication that Perjury Is Aggravating Factor*

On cross-examination, a defense psychologist, Shawn Johnston, insisted that despite his violent criminal past defendant was "not incapable of rehabilitating himself within the prison context." The prosecutor then asked Johnston a series of questions about defendant's failure to rehabilitate himself while in prison and on parole for the 1979 Bianchi assault; his failure to take Antabuse, as ordered, despite recognition that alcohol abuse was part of his problem; and his having "lied through his teeth" in the March 21 and March 22 interviews with the sheriff's detectives. The prosecutor then posed the following question: "In this case Duane Holloway in the guilt phase took the stand and under oath swearing to tell the truth, the whole truth and nothing but the truth, lied through his teeth in 1992. [¶] Wouldn't it be a reasonable interpretation of that that Duane Holloway in this passage of over nine years has not rehabilitated at all with regard to his murders of Diane Pencin and Debra Cimmino?"

Defendant's objection that the question assumed a fact not in evidence (that he had "lied through his teeth" in his testimony) was sustained, the court noting that "an 'if' in there is appropriate. . . . it's up to the jury to decide in this case." But during further cross-examination of Johnston the next day, following a series of questions about defendant's expression of remorse, or lack thereof, for his violent crimes, the prosecutor returned to the subject of his lying in police interviews and his testimony, asking the following: "And in this trial in the guilt phase of this trial, the defendant testified under oath, swearing to tell the truth, the whole truth, and nothing but the truth, and he testified for, oh, probably approximately a day and a half, and you know, do you not, that throughout that testimony concerning the murders of Diane Pencin and Debbie Cimmino, that the defendant repeatedly lied, don't you?"

Defense counsel again objected on the ground the question assumed facts not in evidence. After discussion at the bench regarding the form of a proper hypothetical question in this area (asking whether defendant's having lied in his testimony, if he did, would indicate a lack of ability to rehabilitate), the court ruled it would not allow such a question because of the "difficulty . . . [of] separating a defendant's lying in his own defense . . . from his failure to confess," a subject on which the court deemed questioning improper.

Defendant contends the prosecutor misconducted himself by asking these two questions. The questions were argumentative, he contends, and prejudicial in that they "invited the jurors to consider [defendant's] assertedly false testimony at the guilt phase as evidence in aggravation [in violation of] both state law and federal constitutional restrictions." He argues commission of perjury, a nonviolent crime, does not fit within any of the sentencing factors listed in section 190.3; its use against defendant thus violated state law and deprived him of his due process and Eighth Amendment rights to have his sentence decided on grounds relevant to his character and prospect for rehabilitation.

▉ We disagree with defendant's claim that the prosecutor, in posing the challenged questions, invited the jury to consider defendant's commission of perjury as a factor in aggravation. The questions were put to the psychologist, Johnston, in the course of cross-examination on the subject of defendant's remorse for his actions and the ongoing rehabilitation to which Johnston had previously testified. The prosecutor's aim was clearly to probe Johnston's optimistic assessment of defendant's personal growth by confronting the witness with defendant's assertedly continuing pattern of falsehoods regarding the killing of Pencin and Cimmino. No reasonable juror would have taken the prosecutor's questions as suggesting defendant should be sentenced to death because he committed perjury. As defendant concedes, the prosecutor "could permissibly adduce [defendant's] allegedly false testimony in rebuttal of the claim that [defendant] had been rehabilitated since 1983 . . . ." The prosecutor did not misconduct himself in attempting to do precisely that.[14]

We also note the absence of any reasonably possible prejudice. The prosecutor's questions may have been defective in form, but defendant's objections to them were sustained. The jury was instructed that counsel's questions were not evidence, that they should not assume to be true any fact

---

[14] Defendant points to the prosecutor's use in penalty argument of defendant's assertedly false guilt phase testimony as reinforcing the prejudicial impression that perjury could be a factor in aggravation. To the contrary, this argument (to which defendant raised no objection), like the cross-examination of Johnston, was clearly aimed at rebutting the defense claim that defendant had changed for the positive in the almost 10 years since the murders.

insinuated by a question, and that they should completely disregard any question to which an objection was sustained. We have no reason to believe they disobeyed these instructions. (*People v. Osband* (1996) 13 Cal.4th 622, 714 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

### XXI. *Exclusion of Jail Deputy's Opinion*

Keith Biggers was one of two deputy sheriffs who testified to defendant's good behavior in Sacramento County jail while awaiting and during trial. Defense counsel also asked Biggers whether he had an opinion "as to Mr. Holloway's adjustment in prison if he was to be sentenced to life imprisonment without possibility of parole." The prosecutor objected to the question as calling for evidence "beyond the scope of this witness's experience." At the bench, the prosecutor argued there was no foundation to show the deputy had any experience with life prisoners or inmates in state prison generally. The court agreed the witness did not have "the basis, expertise to give an expert opinion on this subject." The court denied defense counsel's request that he at least be permitted to ask about adjustment to "a structured setting," observing, "I don't know that he knows that either."

Defendant contends the deputy, who had four years' experience as a jail guard, was "clearly qualified to speak about adjustment of inmates to a structured setting," so that the court, in excluding his testimony, abused its discretion and deprived defendant of his Eighth Amendment right to present all relevant evidence in mitigation of punishment. (*Skipper v. South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 106 S.Ct. 1669].)

We disagree. Defendant failed to show the deputy had any experience or other source of expertise as to inmates' adjustment to and life in prison under life sentences; the court correctly refused to allow him to opine on the subject. Phrasing the question in terms of a "structured setting" would not have improved it, as the only "structured setting" with which the jury was concerned was state prison, to which they were being asked to sentence defendant for life. Without experience or study of prison adjustment, the deputy's opinion on this subject would have been highly unreliable. In excluding this unreliable opinion, the court neither abused its discretion under state law nor deprived defendant of any right under the federal Constitution. (*People v. Phillips* (2000) 22 Cal.4th 226, 238 [92 Cal.Rptr.2d 58, 991 P.2d 145]; *People v. Ramos* (1997) 15 Cal.4th 1133, 1175–1176 [64 Cal.Rptr.2d 892, 938 P.2d 950]; *People v. Edwards* (1991) 54 Cal.3d 787, 837–839 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

### XXII. *Improper Impeachment of Defense Character Witness*

Sylvia Wesner, a neighbor of defendant's family when defendant was a teenager, testified that when there was a rash of burglaries in the building,

defendant volunteered to, and did, stay up watching her apartment for several nights. Over defense objection, the prosecutor was permitted to ask Wesner whether she knew at the time that defendant had, in 1976, burglarized an apartment and beaten the woman occupant with a wooden stick (referring to the Carter assault) and whether, had Wesner known of this incident, she would still have trusted defendant to watch over her apartment. Wesner answered that she had heard rumors about the incident, but she trusted defendant anyway.

Defendant contends questioning Wesner about the Carter assault was improper impeachment because Wesner had not testified to an *opinion* regarding defendant's good character but merely to a good deed defendant had performed. "Whether she was aware of [defendant's] other crimes or bad acts did not impeach her testimony of having witnessed a good deed." Again, defendant claims this ruling deprived him of his right to present relevant mitigating evidence under the Eighth Amendment to the federal Constitution.

Again, we disagree. Whatever the intent of defendant's trial counsel in asking Wesner about the apartment-guarding incident, Wesner's testimony regarding it unmistakably conveyed her opinion that defendant was trustworthy, especially in the context of her other testimony giving her opinion that defendant was a reserved, quiet and inquisitive adolescent. The prosecution was entitled to test that opinion by confronting the witness with evidence that defendant himself had burglarized an apartment and assaulted the occupant. (*People v. Siripongs* (1988) 45 Cal.3d 548, 578 [247 Cal.Rptr. 729, 754 P.2d 1306] ["A defendant has no right to mislead the jury through one-sided character testimony during either the guilt or penalty trial"]; *People v. Mickle*, *supra*, 54 Cal.3d at p. 192.)

In any event, no possibility of prejudice appears. The Carter assault was already in evidence. To the extent the defense intended Wesner's testimony simply as an instance of defendant's good conduct, that aspect of the testimony was not impeached—the challenged cross-examination did not tend to show defendant had not guarded Wesner's apartment effectively and in good faith.

XXIII. *Exclusion of Defense Guilt Phase Investigator*

During a recess following the testimony of one of defendant's sisters, the court remarked that Marilyn Mobert, who acted as defense investigator for guilt issues but not for the penalty phase, had been "dabbing her eyes, look[ing] like she was crying during this testimony." Mobert stated she had not been crying but rather had gotten some mascara in her eye. The prosecutor represented that "this is the second occurrence today in which . . .

Ms. Mobert has been identified as . . . reacting to witness's testimony." The court agreed and, saying it was "[n]ot going to take a chance any longer," ordered Mobert, over defense objection, to leave the courtroom for the rest of the day.

Defendant contends the exclusion of Mobert deprived him of a public trial in violation of the Sixth Amendment to the federal Constitution and of what he characterizes as a right of capital defendants under the Eighth Amendment to the presence of "friendly and sympathetic spectators" in the audience to support them so the jury will not be influenced by what might be perceived as the defendant's negative "nontestimonial demeanor." He concedes disruptive spectators may be excluded from the courtroom, but argues a constitutionally insufficient effort to ascertain the facts preceded the trial court's "summary eviction" of Mobert.

 We disagree that defendant was denied his constitutional rights. The temporary exclusion of a single spectator, intended to prevent potentially disruptive displays, did not constitute a cognizable deprivation of the public trial right. (See *People v. Woodward* (1992) 4 Cal.4th 376, 385 [14 Cal.Rptr.2d 434, 841 P.2d 954]; *People v. Hartman* (1894) 103 Cal. 242, 244–245 [37 P. 153].) Nor, even assuming the Eighth Amendment has any application to this situation, was there anything to suggest defendant's demeanor could be significantly impacted by the exclusion of one sympathetic spectator. No constitutional error is apparent.

### XXIV. *Exclusion of Certain Family History Evidence*

Dorothea Holloway, defendant's mother, testified she left her parents' family when she was 17 years old to go with Walter Holloway to Oakland, where defendant was born. Defense counsel then sought to ask Dorothea about her parents' reaction to her "going with Walter Holloway," but the prosecution objected on hearsay grounds. At the bench, counsel represented that Dorothea would testify her parents had disowned her, leaving her to raise her children without any help from an extended family while Walter was "out floundering." Counsel argued the evidence, offered for the nonhearsay purpose of showing Dorothea's knowledge of her own situation, would illuminate defendant's family life as well as his mother's character. The court observed that the evidence would be taken as an implied opinion of Dorothea's parents on Walter's character and excluded the offered testimony on the grounds that the "probative value of [defense counsel's articulated] non-hearsay purpose, if there is such a value, . . . is outweighed by the substantial danger of prejudice that is going to be misused by the jury."

The court's ruling excluding the proposed testimony as more prejudicial, confusing or distracting than probative, under Evidence Code section 352, is

reviewed for abuse of discretion. (*People v. Rowland, supra,* 4 Cal.4th at p. 264.) We find no such abuse of discretion. Though Walter Holloway's deficiencies as a father and role model for defendant were relevant subjects for proof in mitigation, Walter Holloway's character itself was not at issue. The defense penalty case, which rested heavily on proof of the deleterious effects of Walter's behavior on defendant, created a substantial danger the jury's attention and deliberations would incorrectly focus on Walter's character, a danger the court sought to reduce by excluding what could be taken as opinion on that subject. On the probative value side of the scale, the reaction of defendant's maternal grandparents to their daughter's relationship with Walter was of only indirect and remote relevance to defendant's character and experience.

Nor was the proposed testimony needed in order to illuminate the family environment of defendant's childhood, for Dorothea or other members of defendant's nuclear family could have testified that she received no emotional or financial support from her parents in raising her family, without elaborating on the cause of this circumstance. The court did not abuse its discretion, much less deprive defendant of his Eighth Amendment right to present evidence in mitigation (see *People v. Fauber* (1992) 2 Cal.4th 792, 856 [9 Cal.Rptr.2d 24, 831 P.2d 249]), by excluding this marginally relevant testimony because of its potential for prejudice and distraction.

### XXV. *Denial of Mistrial Motion*

On direct examination, defense correctional expert James Park opined that defendant would be eligible for a work assignment if confined for a life term without parole in "Level 4" confinement in a state prison and could contribute to the community in that capacity, but that he "has to be motivated." On cross-examination, the prosecutor asked Park, "Are you aware of the fact that Duane Holloway does not want to be sent to a Level 4, but wants to be sent back to death row where—" Defense counsel immediately objected that no such evidence had been introduced; the objection was sustained.

The prosecutor then asked Park if he had reviewed notes of a psychologist, Dr. Roger Mayer. Park testified he had not seen Mayer's notes or report, that he discussed the report with counsel but only with regard to assessments of defendant's intelligence, and that counsel had not given him any information on defendant's "motivation to be a Level 4 prisoner as opposed to a death row prisoner."

The prosecutor returned to the subject of death row versus Level 4 confinement later in the cross-examination:

"Q. And as you indicated, in Level 4 the most common housing is double celling, two individuals per cell?

"A. Yes, sir.

"Q. And on death row isn't it more likely that the celling will be individual celling?

"A. Yes, sir.

"Q. And wouldn't you agree that to the extent that the defendant, Duane Holloway, values his privacy and doesn't like double celling, he is going to be less motivated to behave himself in a Level 4 facility?"

Defense counsel again objected that the question assumed a fact not in evidence. At the bench, the prosecutor asserted his questions were based on notes, provided him by the defense, generated by Dr. Mayer, which described "the defendant's wanting single celling, valuing his privacy, wanting to be in death row." Defense counsel pointed out that because he might not call Dr. Mayer, the factual basis for the prosecutor's questions might never be established. The court sustained the defense objection, noting that Park might have to be recalled if Mayer did testify.

After Park completed his testimony, defense counsel moved for a mistrial based on the prosecutor's question about defendant preferring death row. The court stated it would hear the motion the next court day, a Monday. On Monday, the court confirmed that defendant personally wished to make a mistrial motion and learned from defense counsel that they did not intend to call Dr. Mayer as a witness. The court then invited argument on the motion.

Defense counsel argued the prosecutor had misconducted himself by posing questions that assumed, as fact, defendant's desire to return to death row, when no such fact was in evidence. By his questioning, the prosecutor "has given permission to the jury to impose the death penalty . . . [by] basically stating that Mr. Holloway wants the death penalty . . . ." This impermissibly relieved the jury of the true weight of their sentencing decision, in violation of the Eighth Amendment to the federal Constitution. "The decision of death," counsel argued, "is to be made based upon the facts in the case, not upon the desire of the defendant."

In response, the prosecutor stated his questions were asked in good faith reliance on Dr. Mayer's notes (copies of which were provided to the court)[15] and that from the discovery provided he assumed Dr. Mayer would be called.

---

[15] The notes included indications defendant had told Mayer he "was comfortable with my shell at the row. . . . I liked privacy" and that "[l]ife without is the kiss of death. I don't want it. I would . . . hate 20, 30, 40 years of main line."

In any event, the objections were sustained and defendant's apparent prefer-ence to be housed on death row was therefore never put before the jury.

The court denied the mistrial motion the next day. The court found the prosecutor had asked the questions in a good faith attempt to rebut Park's direct testimony about defendant's likely adjustment to a life sentence. "It does not appear to me that the questions which were not answered . . . and the jury will be instructed are not evidence in this case, were prejudicial, since it is clear, as I understand it now, that at this point the defendant prefers life." The court offered to give a special admonition if one could be formulated, but apparently none ever was.

On appeal, defendant contends the form and content of the prosecutor's questions, by essentially representing to the jury as fact that defendant preferred death row to confinement on a life sentence, incurably prejudiced his case by partly relieving the jury of the burden it should bear, under the Eighth Amendment to the federal Constitution, to determine the proper penalty. For two reasons, we disagree.

First, the impression a jury might have drawn from the prosecutor's questions was that defendant had told Dr. Mayer he preferred *conditions* on death row to those he would face if confined on a life sentence, not that he preferred dying to serving a life sentence. As the jury's sentencing choice is between *death* and life imprisonment, not between life imprisonment in Level 4 and life imprisonment on death row, such an impression, if acquired, would not tend truly to relieve the jurors of the proper weight of their sentencing decision. Nor is there any reason to believe the penalty jury would be inclined to a death sentence merely because of an impression defendant would be more comfortable on death row than in the state prison general population.

Second, the jury had already been instructed at the guilt phase, and was reinstructed before penalty deliberations, that the questions of counsel are not evidence, that they should not assume to be true any fact insinuated by a question, and that questions, if not answered because of a sustained objection, should be "completely disregarded." As already noted (see pt. XX., *ante*), we have no reason to believe the jury disobeyed those instructions. (*People v. Osband, supra*, 13 Cal.4th at p. 714.)

For these reasons, the trial court did not abuse its discretion in denying a mistrial; the prosecutor's questions were not incurably prejudicial in impact. (*People v. Williams* (1997) 16 Cal.4th 153, 211 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Cooper* (1991) 53 Cal.3d 771, 838–839 [281 Cal.Rptr. 90, 809 P.2d 865].)

## XXVI. *Instructions on Witness Credibility*

Defendant finds error, depriving him of the Eighth Amendment right to a reliable sentencing procedure, in the trial court's repetition at the penalty phase of some, but not all, of the standard instructions previously given at the guilt phase regarding the evaluation of evidence. In particular, he complains that nothing in the penalty phase evidence justified instruction with CALJIC No. 2.20 on factors to consider in assessing a witness's credibility, or with CALJIC No. 2.21.2, stating that a witness willfully false in one aspect of his or her testimony may be distrusted as to others as well.

Defendant waived his objection by failing to raise it at trial when invited to do so by the court. In discussion with the court and prosecutor, defense counsel stated she had "mixed feelings" about giving evidentiary instructions at the penalty phase. She agreed with the court's assessment that she was "ambivalent" on the subject and was not requesting such instructions. The prosecutor also stated he was not requesting evidentiary instructions, but would not object if the defense wanted them. The court then stated it would go through the instructions and eliminate those neither side had asked for and that did not apply to the factual decisions to be made in the penalty phase. As the court orally went through the standard evidentiary instructions, defense counsel responded that she did think CALJIC No. 2.01, on evaluation of circumstantial evidence, was appropriate because it went to the question of lingering doubt as to defendant's guilt. She thought CALJIC No. 2.02, on proof of specific intent, was unnecessary, and objected, as at the guilt phase, to CALJIC Nos. 2.03, 2.04 and 2.06, on inferring consciousness of guilt. Counsel, however, made no response when the court came to CALJIC Nos. 2.20 and 2.21.2, the instructions defendant now contends were erroneously given. With full opportunity to object to the instructions, defendant nonetheless failed in any way to alert the court to his claim they should not be given.

Nor did the giving of these instructions adversely affect defendant's substantial rights, so as to make the claim reviewable without an objection. (§§ 1259, 1469.) Defendant does not claim the instructions are incorrect in any respect. He argues only that some of the factors listed in CALJIC No. 2.20, and CALJIC No. 2.21.2 as a whole, were logically inapplicable to any of the penalty phase evidence, and that a juror might, in trying nonetheless to apply them, have "draw[n] gossamer conclusions about character based on the uncontrolled evaluation of mere appearances." But we cannot assume any juror deliberated in such an irrational way or that the jurors failed to follow the court's standard admonition (CALJIC No. 17.31), repeated in the penalty phase instructions, that they were to disregard any instruction inapplicable to the facts as they found them. There was thus no reasonable

likelihood the jury was misled in the manner defendant hypothesizes. (*People v. Samayoa* (1997) 15 Cal.4th 795, 833 [64 Cal.Rptr.2d 400, 938 P.2d 2].) For the same reason, waiver aside, giving these instructions did not deprive defendant of a reliable penalty determination. (*Ibid.*)

### XXVII. *Instructions on Voluntary Intoxication in Relation to Prior Violent Criminal Activity*

The prosecution presented, under factor (b), evidence of defendant's commission of two prior assaults with deadly weapons (the Carter and Bianchi incidents) and one prior battery on a police officer (the 1979 arrest incident). The trial court instructed the jury that these criminal incidents could be considered in aggravation only if the jury found beyond a reasonable doubt that defendant had committed the criminal acts. The jury was further instructed on the elements of assault with a deadly weapon and battery on a peace officer and told that both crimes required only general criminal intent. Finally, the court gave CALJIC No. 4.20, as follows: "The law provides that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. [¶] In the crime of Battery on a Peace Officer the fact the defendant may have been voluntarily intoxicated is not a defense and does not relieve him of responsibility for the crime."

Without contesting the legal correctness of this instruction, defendant argues it was prejudicially misleading in this case because, especially taken together with the court's instruction on section 190.3, factor (h) (hereafter factor (h)),[16] it suggested that "intoxication had no mitigating force for the factor (b) crimes," thereby unconstitutionally precluding consideration of facts in mitigation.

We conclude the jurors were not reasonably likely (*People v. Samayoa, supra,* 15 Cal.4th at p. 833) to be misled in this manner. Neither the challenged CALJIC No. 4.20 nor the instruction on factor (h) stated or implied that evidence of intoxication during the factor (b) offenses could not be considered in mitigation, and such an inference would have been contrary to the court's other instructions on determination of penalty. Thus, the jurors were told that they should make their penalty decision based on all the evidence, that they could consider factor (b) evidence aggravating *or* mitigating, and that they were free, in general, "to assign whatever moral or

---

[16] The court told the jury it could consider in mitigation whether "at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects of intoxication." (See factor (h).) Defendant argues that because "the offense" in this instruction clearly refers to the capital crimes, it reinforced the impression that intoxication did *not* mitigate prior violent crimes introduced under factor (b).

sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider" and to include in their weighing "any sympathetic or other aspect of the defendant's character *or record* that the defendant offers as a basis for a sentence less than death." (Italics added.) The distinction between a legal excuse or justification for criminal behavior and a circumstance mitigating its moral culpability was also explained, albeit in the context of section 190.3, factor (a), circumstances of the capital offense. A juror attentive to the instructions as a whole was not reasonably likely to conclude that because voluntary intoxication was not a legal defense to assault with a deadly weapon or battery on a peace officer it could not be considered as a mitigating circumstance bearing on defendant's history.

We observe as well that defendant did not request any clarification or modification of the now challenged instruction, which he concedes correctly states the law. The court had no duty to modify the instruction in the absence of such a request. (*People v. Davis* (1995) 10 Cal.4th 463, 543 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Nor was there any potential for prejudice. Only as to the 1979 arrest incident was there any evidence of defendant's intoxication.[17] That battery was the least serious of the factor (b) violent crimes presented—the violence consisted of defendant kicking the officer in the leg—and any restriction the jury might have understood to apply to consideration of the circumstances of that offense could not, on any standard, be considered prejudicial given the two prior assaults and the circumstances of the capital crimes.

### XXVIII. *Penalty Phase Prejudice from Guilt Phase Errors*

Defendant, referencing nine claims of error he has made regarding the conduct of the trial on guilt and special circumstances, contends that even if those asserted errors do not justify complete reversal of the judgment, they were prejudicial at the penalty phase, especially on the question of lingering doubt, and unconstitutionally affected the reliability of the penalty verdict, assertedly in violation of the Eighth and Fourteenth Amendments to the federal Constitution. We have not, however, upheld any of the specified claims of error, and as to the two specified claims where we have assumed error for purposes of discussion (see pts. X. & XIV., *ante*), we have not found prejudice as to guilt or special circumstances. For the same reason, any error in these two respects did not deprive defendant of a reliable penalty decision or prevent him from seeking a life sentence on grounds of lingering doubt as to his guilt.

---

[17] Indeed, in argument to the jury, defense counsel, delineating the lack of similarity between the capital crimes and the Carter and Bianchi assaults, stressed the lack of evidence of intoxication in those prior assaults.

### XXIX. *Combined Prejudice of Penalty Phase Errors*

Not having found any error in the conduct of the penalty trial, nor even assumed any for purposes of discussion, we reject defendant's contention that the errors were prejudicial in combination.

### XXX. *Double Jeopardy Bar After Automatic Appeal*

Defendant contends that because his prior appeal, upon which this court reversed the judgment because of juror misconduct *(People v. Holloway, supra,* 50 Cal.3d at p. 1103), was taken automatically under section 1239, subdivision (b), the constitutional guarantees against double jeopardy precluded his retrial.[18] He reasons that while a criminal appellant ordinarily is deemed to have waived double jeopardy protection by taking the appeal, no such waiver can be imputed when the appeal is taken automatically, by operation of law.

We disagree. We previously rejected such a claim in *People v. Quicke* (1969) 71 Cal.2d 502, 524 [78 Cal.Rptr. 683, 455 P.2d 787], albeit with minimal discussion of the issue. The claim has also been persuasively rejected by the California Court of Appeal *(People v. Powell* (1974) 40 Cal.App.3d 107, 142–144 [115 Cal.Rptr. 109]) and by the federal court of appeals *(Massie v. Hennessey* (9th Cir. 1989) 875 F.2d 1386, 1388–1389).

In *People v. Quicke, supra,* 71 Cal.2d 502, a capital defendant was given a new penalty trial after reversal of his death penalty on automatic appeal (see *People v. Quicke* (1964) 61 Cal.2d 155 [37 Cal.Rptr. 617, 390 P.2d 393]) and was again sentenced to death. On his second automatic appeal, he maintained double jeopardy protections had barred his penalty retrial. We held that the "contention cannot stand; we set aside the judgment in the first penalty trial at the request of defendant." *(People v. Quicke, supra,* 71 Cal.2d at p. 524.)

The same is true in defendant's case. Though defendant and his attorneys were, like Quicke and his attorneys, relieved by section 1239 of the burden of filing a notice of appeal or otherwise *initiating* the first automatic appeal, defendant, through appellate counsel, *pursued* that appeal, seeking and obtaining reversal of the judgment from this court. In his first appeal,

---

[18] Defendant acknowledges he did not plead prior jeopardy as a bar to retrial (§§ 1016, 1017) and so may be deemed to have forfeited the defense. *(People v. Williams* (1999) 21 Cal.4th 335, 343–344 [87 Cal.Rptr.2d 412, 981 P.2d 42].) He also claims, however, that trial counsel rendered ineffective assistance in failing to interpose that plea. We consider the merits of the double jeopardy issue in response to the ineffective assistance claim.

"[d]efendant contend[ed] that jury misconduct during the guilt phase of the trial requires reversal of the judgment." (*People v. Holloway, supra,* 50 Cal.3d at p. 1106.)[19] This court agreed and reversed for that reason. Thus, as in *People v. Quicke,* we "set aside the judgment in the first . . . trial at the request of defendant." (*People v. Quicke, supra,* 71 Cal.2d at p. 524.) Though the first appeal was automatic, reversal was not. As "the original conviction has, *at the defendant's behest,* been wholly nullified and the slate wiped clean" (*North Carolina v. Pearce* (1969) 395 U.S. 711, 721 [23 L.Ed.2d 656, 89 S.Ct. 2072], italics added), the state was free to retry defendant on the charges. "The appeal is fairly characterized as [the appellant's] even though it is mandatory, and his waiver of any defense of double jeopardy must be implied by operation of law." (*Massie v. Hennessy, supra,* 875 F.2d at p. 1389.)

The rationale for permitting retrial after a successful automatic appeal, as after an appeal initiated by the defendant, was further explained in *People v. Powell, supra,* 40 Cal.App.3d 107. The defendants there claimed that because their prior reversals came in automatic appeals under section 1239, the appeals could not be considered waivers of double jeopardy rights. The appellate court agreed the automatic appeal is mandatory, but observed "the appeal is certainly not detrimental to the defendant. On the contrary, a substantial benefit is afforded by this procedure, both to the accused and to society, when the most severe of all penalties has been imposed. It is not logical that its provisions should operate to the benefit of the accused and to the detriment of society." (*People v. Powell, supra,* at p. 143.)

Similarly, in *Massie v. Hennessy,* the Ninth Circuit emphasized that California's automatic appeal procedure serves the vital goal, one mandated by the federal Constitution, of "ensuring against arbitrariness and caprice in a murder conviction and imposition of the death sentence. This most important concern must override any double jeopardy objection Massie may have." (*Massie v. Hennessy, supra,* 875 F.2d at p. 1388.) As the United States Supreme Court has explained in upholding retrial after a defendant's successful appeal, " 'It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.' " (*North Carolina v. Pearce, supra,* 395 U.S. at p. 721, fn. 18, quoting *United States v. Tateo* (1964) 377 U.S. 463, 466 [12 L.Ed.2d 448, 84 S.Ct. 1587].)

---

[19] Nothing in our prior opinion indicates, and defendant does not now suggest, that counsel in his first appeal pursued the appeal, briefed the claim of jury misconduct, or sought reversal of the judgment against defendant's wishes. (Cf. *People v. Massie, supra,* 19 Cal.4th at p. 562.)

That price would be truly exorbitant were California forced to choose between abandoning the automatic appeal procedure, thereby increasing the likelihood that errors in capital proceedings would go uncorrected and unremedied, and immunizing from retrial, because of errors not going to the sufficiency of the evidence of guilt, defendants charged with the most heinous crimes. The existing general rule of automatic appeal with the possibility of retrial after reversal serves both the accused's right to be given a fair trial and " 'the societal interest in punishing one whose guilt is clear after he has obtained such a trial.' " (*Ibid.*) Defendant does not persuade us the rule violates double jeopardy principles.

### XXXI. *Constitutionality of Death Penalty Statute*

Defendant contends various aspects of California's capital sentencing procedures violate the Sixth, Eighth and Fourteenth Amendments to the federal Constitution. We have repeatedly rejected defendant's claims in prior decisions, and defendant's argument offers no grounds for reconsidering these holdings. The federal Constitution does not require written findings or unanimous agreement of the jurors on aggravating and mitigating circumstances, nor that each juror find death the appropriate sentence beyond a reasonable doubt, nor that an intercase proportionality review be conducted of the death sentence returned by the jury. (*People v. Snow* (2003) 30 Cal.4th 43, 126 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1137, 1139 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Lucero* (2000) 23 Cal.4th 692, 741 [97 Cal.Rptr.2d 871, 3 P.3d 248]; *People v. Majors*, *supra*, 18 Cal.4th at p. 432; *People v. Samayoa, supra*, 15 Cal.4th at p. 862.)

### DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied September 1, 2004.